# KNOWLTON *v.* MOORE.[1]

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EAST-
ERN DISTRICT OF NEW YORK.

No. 387. Argued December 5, 6, 7, 1899. —Decided May 14, 1900.

The plaintiffs in error were the executors of the will of Edwin F. Knowlton,
of Brooklyn, New York. The defendant in error was the United States
Collector of Internal Revenue for the First Collection District for the State
of New York. Mr. Knowlton died at Brooklyn in October, 1898, and his
will was duly proved. Under the portion of the act of Congress of June 13,
1898, which is printed at length in a note to the opinion of the court in
this case, the United States Collector of Internal Revenue demanded of
the executors a return, showing the amount of the personal estate of the
deceased, and the legatees and distributees thereof. This return the exec-
utors made under protest, asserting that the act of June 13 was unconsti-
tutional. This return showed that the personal estate amounted to over
two and a half millions of dollars, and that there were several legacies,
ranging from under $10,000 each to over $1,500,000. The collector levied
the tax on the legacies and distributive shares, but for the purpose of
fixing the rate of the tax considered the whole of the personal estate of
the deceased as fixing the rate for each, and not the amount coming to
each individual legatee under the will. As the rates under the statute
were progressive from a low rate on legacies amounting to $10,000, to a
high rate on those exceeding $1,000,000, this decision greatly increased
the aggregate amount of the taxation. The executors protested on the
grounds, (1) that the provisions of the act were unconstitutional; (2) that
legacies amounting to less than $10,000, were not subject to any tax or
duty; (3) that a legacy of $100,000, taxed at the rate of $2.25 per $100,
was only subject to the rate of $1.12½. Demand having been made by
the collector for payment, payment was made under protest ; and, after
the Commissioner of Internal Revenue had refused to refund any of it,
the executors commenced suit to recover the amount so paid. The Cir-
cuit Court sustained a demurrer upon the ground that no cause of action
was alleged, and dismissed the suit, which was then brought here by writ
of error. *Held :*
(1) That the statute clearly imposes the duty on the particular legacies
    or distributive shares, and not on the whole personal esstate;

---

[1] The docket title of this case is Eben J. Knowlton and Thomas A. Buffum,
executors of the last will and testament of Edwin F. Knowlton, deceased,
plaintiffs in error, v. Frank B. Moore, United States Collector of Internal
Revenue, First Collection District, State of New York.

(2) That it makes the rate of the tax depend upon the character of the links connecting those taking with the deceased, being primarily determined by the classifications, and progressively increased according to the amount of the legacies or shares ;

(3) That the court below erred in denying all relief, and that it should have held the plaintiffs entitled to recover so much of the tax as resulted from taxing legacies not exceeding ten thousand dollars, and from increasing the tax rate with reference to the whole amount of the personal estate of the deceased from which the legacies or distributive shares were derived.

Death duties were established by the Roman and ancient law, and by the modern laws of France, Germany and other continental countries, England and her colonies, and an examination of all shows that tax laws of this nature rest in their essence upon the principle that death is the generating source from which the particular taxing power takes its being, and that it is the power to transmit or the transmission from the dead to the living on which such taxes are more immediately vested.

When a particular construction of a statute will occasion great inconvenience, or produce inequality and injustice, that view is not to be favored if another and more reasonable interpretation is present in the statute.

The provision in section 8 of article I of the Constitution that "all duties, imports and excises shall be uniform throughout the United States," refers purely to a geographical uniformity, and is synonymous with the expression "to operate generally throughout the United States."

The statute considered in this case embraces the District of Columbia.

THE case is stated in the opinion of the court.

*Mr. John G. Carlisle, Mr. Wheeler H. Peckham* and *Mr. Charles H. Otis* for plaintiffs in error. *Mr. Peter B. Olney, Mr. William Edmond Curtis, Mr. Henry M. Ward, Mr. Ward B. Chamberlin, Mr. George F. Chamberlin, Mr. Julien T. Davies, Mr. Frederic R. Coudert, Jr., Mr. E. S. Mansfield* and *Mr. W. S. V. Hopkins* were on Mr. Carlisle's brief. *Mr. Thomas B. Reed, Mr. Thomas Thacher* and *Mr. Charles H. Otis* filed briefs for plaintiffs in error.

*Mr. Solicitor General* for defendants in error.

*Mr. John G. Carlisle* and *Mr. Henry M. Ward* filed an additional brief, and *Mr. Wheeler H. Peckham, Mr. Peter B. Olney* and *Mr. William Edmond Curtis* were on this brief, and

*Mr. Thomas B. Reed* and *Mr. Thomas Thacher* for plaintiffs in error filed a brief in response to the suggestion of the court by its order of February 26, 1900, etc. *Mr. Solicitor General* filed a supplemental brief in response to the suggestion of the court.

MR. JUSTICE WHITE delivered the opinion of the court.

The act of Congress of June 13, 1898, c. 448, which is usually spoken of as the War Revenue Act, (20 Stat. 448,) imposes various stamp duties and other taxes. Sections 29 and 30 of the statute, which are therein prefaced by the heading "Legacies and Distributive Shares of Personal Property," provide for the assessment and collection of the particular taxes which are described in the sections in question. To determine the issues which arise on this record it is necessary to decide whether the taxes imposed are void because repugnant to the Constitution of the United States, and if they be valid, to ascertain and define their true import.

The controversy was thus engendered : Edwin F. Knowlton died in October, 1898, in the borough of Brooklyn, State of New York, where he was domiciled. His will was probated, and the executors named therein were duly qualified. As a preliminary to the assessment of the taxes imposed by the provisions of the statute, the collector of internal revenue demanded of the executors that they make a return showing the amount of the personal estate of the deceased, and disclosing the legatees and distributees thereof. The executors, asserting that they were not obliged to make the return because of the unconstitutionality of sections 29 and 30 of the statute, nevertheless complied, under protest. The report disclosed that the personal estate was appraised at $2,624,029.63, and afforded full information as to those entitled to take the same. The amount of the tax assessed was the sum of $42,084.67. This was reached according to the computation shown in the table which is printed on the following page.

Opinion of the Court.

| Names of persons entitled to beneficial interest in said property. | Relationship of beneficiary to persons who died possessed. | Clear value of legacy. | Amount taxable. | Rate for every $100. | Amount of tax. |
|---|---|---|---|---|---|
| Mary, Countess von Francken Sierstorpff . . . . . . Furniture . . . . . . . . . . $ 1,065. Cash legacy . . . . . . . . 100,000. Income for life on residuary estate, amounting to $2,348,734.67. Countess Sierstorpff became 28 years of age on July 2, 1898. Present value of her life interest in said residuary estate, estimated according to United States tables is, . . . $1,639,931.35 Total . . . $1,639,931.35 | Daughter | $1,731,996.35 | $1,731,996.35 | 2.25 | 38,969.92 |
| George W. Knowlton . . . . . . . . | Brother | 100.00 | 100.00 | 2.25 | 2.25 |
| Charlotte A. Batchelor . . . . . . . . | Sister | 5,000.00 | 5,000.00 | 2.25 | 112.50 |
| Eben J. Knowlton . . . . . . . . | Brother | 100,000.00 | 100,000.00 | 2.25 | 2,250.00 |
| Unitarian Church of West Upton, Mass. . . . . . . . . The remainder of said residuary estate is subject to contingencies, and the individuals who will ultimately become entitled to the same on their degree of relationship to the testator cannot be determined until after the termination of two lives now in being. The present value of the said remainder of said residuary estate, estimated as aforesaid, is $717,803.30 | None . . . . | 5,000.00 717,803.30 | 5,000.00 | 15. | 750.00 |
| Total . . . . . . . . | . . . . | $2,559,899.65 | $1,842,096.35 | . . . . | 42,084.67 |

It is apparent, from the table, that the collector, whilst levying the tax on the legacies and distributive shares, or the right to receive the same, yet, for the purpose of fixing the rate of the tax, took into view the whole of the personal estate of the deceased. That is, whilst the tax was laid upon the legacies, the rate thereof was fixed by a separate and distinct right or thing, the entire personal estate of the deceased. The executors protested against the entire tax, and also as to the method by which it was assessed. The grounds of the protest were as follows:

"1. The provisions of the act of Congress under which it is sought to impose, assess and collect the said tax or duty are in

violation of the provisions of article I, sections 8 and 9, of the Constitution of the United States, and are therefore void.

" 2. The legacies to George W. Knowlton, Charlotte A. Batchelor, the Unitarian Church of West Upton, Mass., each amount to less than $10,000, and are not subject to any tax or duty under the said provisions of the said act of Congress, even if such provisions be not unconstitutional and void.

" 3. The legacy to Eben J. Knowlton, a brother of the testator, amounts to only $100,000, and under the said provisions of the said act should be taxed at the rate of $1.12½ per $100, and not at the rate of $2.25 per $100, even if said act be not unconstitutional and void."

Demand having been made by the collector for the payment, accompanied with a threat to distrain in case of refusal, the tax was paid under written protest, which repeated the grounds above stated. In the receipt given it was recited that the tax had been paid under protest to avoid the use of compulsory process. A petition for refunding was subsequently presented, by the executors, in which the grounds of the protest were reiterated. The Commissioner of Internal Revenue having made an adverse ruling, the present suit was commenced to recover the amount paid. The facts as to the assessment and collection of the taxes were averred, and the refusal of the internal revenue commissioner to refund was alleged. The petition for refunding was made a part of the pleadings. The right to repayment was based upon the averment that the sections of the statute, under authority of which the amount had been assessed and collected, were unconstitutional. The Circuit Court sustained a demurrer, on the ground that no cause of action was alleged. The claim was rejected, and the suit was dismissed with costs.

The questions which arise on this writ of error, to review the judgment of the Circuit Court, are fourfold: First, that the taxes should have been refunded because they were direct taxes, and not being apportioned were hence repugnant to article 1, section 8, of the Constitution of the United States; second, if the taxes were not direct, they were levied on rights created solely by state law, depending for their continued existence on the consent of the several States, a volition which Congress

has no power to control, and as to which it could not, therefore, exercise its taxing authority ; third, if the taxes were not direct, and were not assessed upon objects or rights which were beyond the reach of Congress, nevertheless the taxes were void, because they were not uniform throughout the United States, as required by article 1, section 9, of the Constitution of the United States; fourth, because, although the taxes be held to have been in all respects constitutional, nevertheless they were illegal, since in their assessment the rate of the tax was determined by the aggregate amount of the personal estate of the deceased, and not by the sum of the legacies or distributive shares, or the right to take the same, which were the objects upon which by law the taxes were placed.

Although it may be, in the abstract, an analysis of these questions, in logical sequence, would require a consideration of the propositions in the order just stated, we shall not do so for the following reasons : The inquiry whether the taxes are direct or indirect must involve the prior determination of the objects or rights upon which by law they are imposed and assessed, since it becomes essential primarily to know what the law assesses and taxes in order to completely learn the nature of the burden.    So, also, to solve the contention as to want of uniformity, it is requisite to understand not only the objects or rights which are taxed, but the method ordained by the statute for assessing and collecting.    This must be the case, since uniformity, in whatever aspect it be considered, involves knowledge as to the operation of the taxing law, an understanding of which cannot be arrived at without a clear conception of what the law commands to be done.    For these reasons we shall first, in a general way, consider upon what rights or objects death duties, as they are termed in England, are imposed.    Having, from a review of the history of such taxes, reached a conclusion on this subject, we shall decide whether Congress has power to levy such taxes.    This being settled, we shall analyze the particular act under review, for the purpose of ascertaining the precise form of tax for which it provides and the mode of assessment which it directs.    These questions being disposed of, we

shall determine whether the taxes which the act imposes are void, because not apportioned or for the want of uniformity.

It is conceded on all sides that the levy and collection of some form of death duty is provided by the sections of the law in question. Bearing this in mind, the exact form of the tax and the method of its assessment need not be presently defined, since doing so appropriately belongs to the more specific interpretation of the statute to which we shall hereafter direct our attention. Taxes of this general character are universally deemed to relate, not to property *eo nomine*, but to its passage by will or by descent in cases of intestacy, as distinguished from taxes imposed on property, real or personal as such, because of its ownership and possession. In other words, the public contribution which death duties exact is predicated on the passing of property as the result of death, as distinct from a tax on property disassociated from its transmission or receipt by will, or as the result of intestacy. Such taxes so considered were known to the Roman law and the ancient law of the continent of Europe. Smith's Wealth of Nations, London ed. of 1811, vol. 3, p. 311. Continuing the rule of the ancient French law, at the present day in France inheritance and legacy taxes are enforced, being collectible as stamp duties. They are included officially under the general denomination of indirect taxes, for the reason that all inheritance and legacy taxes are considered as levied on the " occasion of a particular isolated act." This view of the inheritance and legacy tax conforms to the official definition of indirect taxes, among which inheritance and legacy taxes are classed, which prevails in France at the present day. The definition is as follows:

"Direct taxes bear immediately upon persons, upon the possession and enjoyments of rights ; indirect taxes are levied upon the happening of an event or an exchange."

In Germany and other continental countries in various forms death duties are enforced, in the main, by way of stamp duties. They are there, both in theory and in practice, treated as resulting from the occasion of death, and hence as not legally equivalent with taxes levied on property merely because of its

ownership.   Cohn's Science of Finance (Veblen's translation),
secs. 282, 283, 350 ;  Dos Passos' Inheritance Tax Law, sec. 1.

The term "Death Duties," by which inheritance and legacy
taxes, in whatever form imposed, are described in England, in-
dicates the generic nature of such taxes.   In Hanson's Death
Duties, p. 1, it is said :  "Historically, probate duty is the oldest
form of death duty, having been established in 1694."   The
probate duty thus referred to was a fixed tax dependent on the
sum of the personal estate within the jurisdiction of the probate
court, payable on the grant of letters of probate by means of
stamp duties, and was treated as an expense of administration
to be deducted out of the residue of the estate.   In 1780 this
tax was supplemented by what became known as a legacy tax,
at first collected by means of a stamp affixed to the receipt, evi-
dencing the payment of a legacy or share in the personal prop-
erty of a deceased person.   It is unnecessary to consider the
change in the mere form of this latter tax.   The tax was not
deducted as an expense of administration, but was charged and
collected upon the passing of the individual legacies or interests
upon which it was imposed.   In 1853 the probate duty tax and
the legacy tax, just referred to, were supplemented by a tax
known as the succession duty.   This law reached interests in
real estate passing or acquired by the death of a person and in-
terests in personal property not covered by the legacy act.
This also was not treated as an expense of administration, but
was charged upon and collected out of the particular interests
subjected to the tax.

The nature of the succession duty is shown by the second sec-
tion of the act defining the same, which is thus condensed by
Hanson at page 40 of his treatise :

"Succession duty is a tax placed on the gratuitous acquisition
of property which passes on the death of any person, by means
of a transfer (called either a disposition or a devolution) from
one person (called the predecessor) to another person (called the
successor).   Property chargeable with this tax is called a suc-
cession."

By the Finance Act of 1894, the probate duty was superseded
by what was termed the estate duty.   This, like the probate

duty, was a tax distinct from those imposed by the Legacy and Succession Duty Acts upon the receipt of real or personal property, or an interest therein, although in some administrative features it modified or regulated the subject of a succession duty. This tax is payable out of the general revenue of the estate. *Re Bourne*, (1893) 1 Ch. 188, cited by Hanson at p. 354.

The principle upon which the tax rests is thus stated by Hanson at p. 63 :

" The new duty imposed by the Finance Act, and called estate duty, as has been said above, supersedes probate duty ; but the key to the construction of the Finance Act lies in remembering that the new estate duty, although it is leviable on property which was left untouched by probate duty, such as real estate, yet is in substance of the same nature as the old probate duty. What it taxes is not the interest to which some person succeeds on a death, but the interest which ceased by reason of the death. Unless this principle is kept clearly in view, the mind is constantly tempted by the wording of the act to revert to principles of succession duty which have no real connection with the subject."

This summary suffices to indicate the origin, the development and the theory underlying death duties. A full analysis thereof will be found in Dowell's History of Taxation, vol. 3, p. 148, *et seq. ;* in Hanson's Death Duties ; and in the treatise of Dos Passos, section 4, and notes, where the various acts are referred to.

In the colonies of Great Britain death duties, as a general rule, obtain. Some of the statutes are modeled upon those of the mother country, and levy taxes on legacies, etc., passing, measured by their value and on the estate proper. Others, again, have merely the estate tax without the legacy tax. The statutes are reviewed in the appendix to Hanson's treatise, beginning at page 717.

A retrospective study of the death duty laws enacted in our own country, national and state, will show that they rest upon the same fundamental conception which has caused the adoption of like statutes in other countries ; and, especially in their national development, do they substantially conform (to the

extent to which they go) to the evolution of the system in England.

As early as 1797 Congress imposed a legacy tax. Act of July 6, 1797, c. 11, 1 Stat. 527. This act was probably the outgrowth of a recommendation contained in a report of the Committee of Ways and Means, presented in the House on Tuesday, March 17, 1796. Annals of Congress, Fourth Congress, first session, pp. 993, *et seq.* The report recommended, 1, the collection of two millions of dollars by a direct tax; 2, the imposition of "a *duty* of two per centum ad valorem . . . on all testamentary dispositions, descents and successions to the estates of intestates, excepting those to parents, husbands, wives or lineal descendants;" 3, the imposition of various stamp duties; and, 4, an increase of the duty on carriages. The act of 1797 continued in force until June 30, 1802. 2 Stat. 148, c. 17. In this act, as in the English legacy duty statute of 1780 and supplementary statutes, the mode of collection provided was by stamp duties laid on the receipts evidencing the payment of the legacies or distributive shares in personal property, and the amount was, like the English legacy tax, charged upon the legacies and not upon the residue of the personal estate. The text of the statute is printed in the margin.[1]

---

[1] Chapter XI, July 6, 1797.

"SECTION 1. *Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,* That from and after the thirty-first day of December next, there shall be levied, collected and paid throughout the United States, the several stamp duties following, to wit: For every skin or piece of vellum, or parchment, or sheet or piece of paper upon which shall be written or printed any or either of the instruments or writings following, to wit: . . . any receipt or other discharge for or on account of any legacy left by any will or other testamentary instrument, or for any share or part of a personal estate divided by force of any statute of distributions, the amount whereof shall be above the value of fifty dollars, and shall not exceed the value of one hundred dollars, twenty-five cents; where the amount thereof shall exceed the value of one hundred dollars and shall not exceed five hundred dollars, fifty cents; and for every further sum of five hundred dollars, the additional sum of one dollar. . . . *Provided,* That nothing in this act contained shall extend to charge with a duty any legacy left by any will or other testamentary instrument, or any share or part of a personal estate, to be divided by

In sections 111 and 112 of chapter 119, act of July 1, 1862, 12 Stat. 433, 485, a legacy tax was again enacted. Like in character to the act of 1797, this was a tax imposed on legacies or distributive shares of personal property. But in the same chapter was contained still another form of death duty. By section 194 a probate duty, proportioned to the amount of the estate and to be paid by way of stamps, was levied. The result of the act of 1862, therefore, was to cause the death duties imposed by Congress to greatly resemble those then existing in England; that is, first, a legacy tax, chargeable against each legacy or distributive share, and a probate duty chargeable against the mass of the estate. The only difference between the system created by the act of 1862 and that existing in England was that the act of 1862 did not embody the succession tax provided for in England, by which interests in real estate passing by death were subjected to a duty. A detailed reference to the provisions of the act of 1862 need not be made, because we shall have occasion to do so in considering the legislation which, in 1864, in effect reënacted, although largely increasing the rates, both the probate duty or tax on the whole estate and the legacy tax on each particular legacy or distributive share. The act of 1864, however, added, in separate sections, a duty on the passing of real estate, in substantial harmony with the principle of the succession tax expressed in the English Succession Duty Act. Thus it came to pass that the system of death duties prevailing in England and that adopted by Congress — leaving out of view the differences in rates and the administrative provisions — were substantially identical, and of a threefold nature, that is, a probate duty charged upon the whole estate, a legacy duty charged upon each legacy or distributive share of personalty, and a succession duty charged against each interest in real property. The act of 1864 was amended in several particulars by the act of July 13, 1866. 14 Stat. 140. These amend-

force of any statute of distributions which shall be left to, or divided amongst, the wife, children, or grandchildren of the person deceased intestate, or making such will or testamentary instrument, or any recognizance, bill, bond, or other obligation or contract, which shall be made to or with the United States, or any State, or for their use respectively."

ments, however, did not materially modify the system of taxation provided in the act of 1864.

Whilst the general plan of the act of 1864 shows that its framers had in mind the English law, this fact was conclusively demonstrated by section 127, wherein the succession or real estate inheritance tax was defined in substantially similar terms to that contained in the English Succession Duty Act. The identity of the conception embodied in the act of 1864 with that existing in England was observed by this court in *Scholey* v. *Rew*, 23 Wall. 331, where, in holding that the subject matter of the assessment of a succession tax was the devolution of the estate or the right to become beneficially entitled to the same, etc., the court said (p. 349):

"Decided support to the proposition that such is the true theory of the act is derived from the fact that the act of Parliament from which the particular provision under discussion was largely borrowed has received substantially the same construction."

In the statute of August 27, 1894, 28 Stat. 509, c. 349, what was in effect a legacy tax was imposed by the provisions of section 28. Ib. 553. The tax was *eo nomine* an income tax, but was in one respect the legal equivalent of a legacy tax, since among the items going to make up the annual income which was taxed was "money and the value of all personal property acquired by gift or inheritance." This law was not enforced. Its constitutionality was assailed on the ground that the income tax, in so far as it included the income from real estate and personal property, was a direct tax within the meaning of the Constitution, and was void because it had not been apportioned. The contention was twice considered by this court. On the first hearing, in *Pollock* v. *Farmers' Loan & Trust Company*, 157 U. S. 429, it was decided that, to the extent that the income taxes included the rentals from real estate, the tax was a direct tax on the real estate, and was therefore unconstitutional, because not apportioned. Upon the question of whether the unconstitutionality of the tax on income from real estate rendered it legally impossible to enforce all the other taxes provided by the statute, the court was equally divided in opinion.

Ib. 586. On a rehearing (158 U. S. 601) the previous opinion was adhered to, and it was moreover decided that the tax on income from personal property was likewise direct, and that the law imposing such tax was therefore void because not providing for apportionment. The court said (p. 637):

" *Third.* The tax imposed by sections twenty-seven to thirty-seven, inclusive, of the act of 1894, so far as it falls on the income of real estate and of personal property, being a direct tax within the meaning of the Constitution, and, therefore, unconstitutional and void because not apportioned according to representation, all those sections, constituting one entire scheme of taxation, are necessarily invalid."

The decision, that the invalidity of the income tax, in the particulars quoted, carried with it the other and different taxes which were included in income, was not predicated upon the unconstitutionality of such other taxes, but solely upon the conclusion that by the statute there was such an inseparable union between the elements of income derived from the revenues of real estate and personal property and the other constituents of income provided in the statute, that they could not be divided. The court said (p. 637):

" We do not mean to say that an act laying by apportionment a direct tax on all real estate and personal property, or the income thereof, might not also lay excise taxes on business, privileges, employments and vocations. But this is not such an act, and the scheme must be considered as a whole. Being invalid as to the greater part, and falling, as the tax would, if any part were held valid, in a direction which could not have been contemplated except in connection with the taxation considered as an entirety, we are constrained to conclude that sections twenty-seven to thirty-seven, inclusive, of the act, which became a law without the signature of the President on August 28, 1894, are wholly inoperative and void."

An inheritance and legacy tax imposed by one of the States (Louisiana) was considered in *Mager* v. *Grima,* 8 How. 490. The opinion of the court, delivered by Mr. Chief Justice Taney, upheld the right to levy such taxes. The same subject was passed on in *United States* v. *Perkins,* 163 U. S. 625. The

question was whether property bequeathed to the United States could be lawfully included in a succession tax. It was decided that it could be. In the opinion, delivered by Mr. Justice Brown, it was said (p. 628):

" The tax is not upon the property in the ordinary sense of the term, but upon the right to dispose of it, and it is not until it has yielded its contribution to the State that it becomes the property of the legatee."

Again (p. 629):

" That the tax is not a tax upon the property itself, but upon its transmission by will or descent, is also held, both in New York and in several other States."

Yet again (p. 630):

" We think that it follows from this that the act in question is not open to the objection that it is an attempt to tax the property of the United States, since the tax is upon the legacy before it reaches the hands of the Government. The legacy becomes the property of the United States only after it has suffered a diminution to the amount of the tax, and it is only upon this condition that the legislature assents to a bequest of it."

Once more, quite recently, the subject was considered in *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283. The issue for decision was this: A law of the State of Illinois imposed a legacy and inheritance tax, the rate progressing by the amount of the beneficial interest acquired. This progression of rates was assailed in the courts of Illinois as being in violation of the constitution of that State, requiring equal and uniform taxation. The state court having decided that the progressive feature did not violate the constitution of the State, the case came to this court upon the contention that the establishment of a progressive rate was a denial both of due process of law and of the equal protection of the laws within the meaning of the Fourteenth Amendment to the Constitution. These complaints were held to be untenable. In the course of its opinion the court, speaking through Mr. Justice McKenna, after briefly adverting to the history of inheritance and legacy taxes

in other countries, referred to their adoption in many of the States of the Union as follows (pp. 287–288):

"In the United States they were enacted in Pennsylvania in 1826; Maryland, 1844; Delaware, 1869; West Virginia, 1887, and still more recently in Connecticut, New Jersey, Ohio, Maine, Massachusetts, 1891; Tennessee in 1891, chapter 25, now repealed by chapter 174, Acts, 1893. They were adopted in North Carolina in 1846, but repealed in 1883. Were enacted .in Virginia in 1844, repealed in 1855, reënacted in 1863, and repealed in 1884. Other States have also enacted them.—Minnesota by constitutional provision.

"The constitutionality of the taxes have been declared, and the principles upon which they are based explained in *United States* v. *Perkins*, 163 U. S. 625, 628; *Strode* v. *Commonwealth*, 52 Penn. St. 181; *Eyre* v. *Jacob*, 14 Grat. 422; *Schoolfield* v. *Lynchburg*, 78 Virginia, 366; *State* v. *Dalrymple*, 70 Maryland, 294; *Clapp* v. *Mason*, 94 U. S. 589; *In re Merriam's Estate*, 141 N. Y. 479; *State* v. *Hamlin*, 86 Maine, 495; *State* v. *Alston*, 94 Tennessee, 674; *In re Wilmerding*, 117 California, 281; Dos Passos Collateral Inheritance Tax, 20; *Minot* v. *Winthrop*, 162 Mass. 113; *Gelsthorpe* v. *Furnell*, (Montana) 51 Pac. Rep. 267. See also *Scholey* v. *Rew*, 23 Wall. 331.

"It is not necessary to review these cases or state at length the reasoning by which they are supported. They are based on two principles: 1. An inheritance tax is not one on property, but one on the succession. 2. The right to take property by devise or descent is a creature of the law, and not a natural right — a privilege, and therefore the authority which confers it may impose conditions upon it. From these principles it is deduced that the States may tax the privilege, discriminate between relatives, and between these and strangers, and grant exemptions; and are not precluded from this power by the provisions of the respective state constitutions requiring uniformity and equality of taxation."

Thus, looking over the whole field, and considering death duties in the order in which we have reviewed them, that is, in the Roman and ancient law, in that of modern France, Germany and other continental countries, in England and those of

her colonies where such laws have been enacted, in the legislation of the United States and the several States of the Union, the following appears : Although different modes of assessing such duties prevail, and although they have different accidental names, such as probate duties, stamp duties, taxes on the transaction, or the act of passing of an estate or a succession, legacy taxes, estate taxes or privilege taxes, nevertheless tax laws of this nature in all countries rest in their essence upon the principle that death is the generating source from which the particular taxing power takes its being and that it is the power to transmit, or the transmission from the dead to the living, on which such taxes are more immediately rested.

Having ascertained the nature of death duties, the first question which arises is this : Can the Congress of the United States levy a tax of that character ?  The proposition that it cannot rests upon the assumption that, since the transmission of property by death is exclusively subject to the regulating authority of the several States, therefore the levy by Congress of a tax on inheritances or legacies, in any form, is beyond the power of Congress, and is an interference by the National Government with a matter which falls alone within the reach of state legislation.  It is to be remarked that this proposition denies to Congress the right to tax a subject-matter which was conceded to be within the scope of its power very early in the history of the government.  The act of 1797, which ordained legacy taxes, was adopted at a time when the founders of our government and framers of our Constitution were actively participating in public affairs, thus giving a practical construction to the Constitution which they had helped to establish.  Even the then members of the Congress who had not been delegates to the convention, which framed the Constitution, must have had a keen appreciation of the influences which had shaped the Constitution and the restrictions which it embodied, since all questions which related to the Constitution and its adoption must have been, at that early date, vividly impressed on their minds.  It would, under these conditions, be indeed surprising if a tax should have been levied without question upon objects deemed to be beyond the grasp of Congress because exclusively within state authority.

It is, moreover, worthy of remark that similar taxes have at other periods and for a considerable time been enforced; and, although their constitutionalty was assailed on other grounds held unsound by this court, the question of the want of authority of Congress to levy a tax on inheritances and legacies was never urged against the acts in question. Whilst these considerations are of great weight, let us for the moment put them aside to consider the reasoning upon which the proposition denying the power in Congress to impose death duties must rest.

Confusion of thought may arise unless it be always remembered that, fundamentally considered, it is the power to transmit or the transmission or receipt of property by death which is the subject levied upon by all death duties. The qualification of such taxes as privilege taxes, or describing them as levied on a privilege, may also produce misconception, unless the import of these words be accurately understood. They have been used where the power of a state government to levy a particular form of inheritance or legacy tax has in some instances been assailed because of a constitutional limitation on the taxing power. Under these circumstances, the question has arisen whether, because of the power of the State to regulate the transmission of property by death, there did not therefore exist a less trammeled right to tax inheritances and legacies than obtained as to other subject-matters of taxation, and, upon the affirmative view being adopted, a tax upon inheritances or legacies for this reason has been spoken of as privilege taxation, or a tax on privileges. The conception, then, as to the privilege, whilst conceding fully that the occasion of the transmission or receipt of property by death is a usual subject of the taxing power, yet maintains that a wider discretion or privilege is vested in the States, because of the right to regulate. Courts which maintain this view have therefore treated death duties as disenthralled from limitations which would otherwise apply, if the privilege of regulation did not exist. The authorities which maintain this doctrine have been already referred to in the citation which we have made from *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 288. An illustration is found in

*United States* v. *Perkins*, 163 U. S. 625, where the right of the State of New York to levy a tax on a legacy bequeathed to the Government of the United States was in part rested on the privilege enjoyed by the State of New York to regulate successions. Some state courts, on the other hand, have held that, despite the power of regulation, no greater privilege of taxation exists as to inheritance and legacy taxes than as to other property. *Cope's Appeal*, 191 Penn. St. 1; *State* v. *Ferris*, 53 Ohio St. 314; *State* v. *Gorman*, 40 Minn. 232; *Curry* v. *Spencer*, 61 N. H. 624. In *State* v. *Switzler*, 143 Missouri, 287, the power of the legislature of Missouri to levy a uniform tax upon the succession of estates was conceded, though such tax was declared not to be a tax upon property in the ordinary sense. The court nevertheless held that the particular tax in question, which was progressive in rate, was invalid, because it violated a provision of the state constitution; the decision, in effect, being that because the legislature had the power to regulate successions, it was not thereby justified in levying a tax which was not sanctioned by the state constitution.

All courts and all governments, however, as we have already shown, conceive that the transmission of property occasioned by death, although differing from the tax on property as such, is, nevertheless, a usual subject of taxation. Of course, in considering the power of Congress to impose death duties, we eliminate all thought of a greater privilege to do so than exists as to any other form of taxation, as the right to regulate successions is vested in the States and not in Congress.

It is not denied that, subject to a compliance with the limitations in the Constitution, the taxing power of Congress extends to all usual objects of taxation. Indeed, as said in the *License Tax Cases*, 5 Wall. 462, 471, after referring to the limitations expressed in the Constitution, " Thus limited, and thus only, it (the taxing power of Congress) reaches every subject, and may be exercised at discretion." The limitation which would exclude from Congress the right to tax inheritances and legacies is made to depend upon the contention that as the power to regulate successions is lodged solely in the several States, therefore Congress is without authority to tax the transmission or

receipt of property by death. This proposition is supported by a reference to decisions holding that the several States cannot tax or otherwise impose burdens on the exclusive powers of the National government or the instrumentalities employed to carry such powers into execution, and, conversely, that the same limitation rests upon the National government in relation to the powers of the several States. *Weston* v. *Charleston,* 2 Pet. 449; *McCulloch* v. *Maryland,* 4 Wheat. 316, 431, 439; *Bank of Commerce* v. *New York City,* 2 Black, 620; *Collector* v. *Day,* 11 Wall. 113, 124; *United States* v. *Railroad Co.,* 17 Wall. 322, 327; *Railroad Co.* v. *Peniston,* 18 Wall. 5.

But the fallacy which underlies the proposition contended for is the assumption that the tax on the transmission or receipt of property occasioned by death is imposed on the exclusive power of the State to regulate the devolution of property upon death. The thing forming the universal subject of taxation upon which inheritance and legacy taxes rest is the transmission or receipt, and not the right existing to regulate. In legal effect, then, the proposition upon which the argument rests is that wherever a right is subject to exclusive regulation, by either the government of the United States on the one hand or the several States on the other, the exercise of such rights as regulated can alone be taxed by the government having the mission to regulate. But when it is accurately stated, the proposition denies the authority of the States to tax objects which are confessedly within the reach of their taxing power, and also excludes the National government from almost every subject of direct and many acknowledged objects of indirect taxation. Thus imports are exclusively within the taxing power of Congress. Can it be said that the property when imported and commingled with the goods of the State cannot be taxed, because it had been at some prior time the subject of exclusive regulation by Congress? Again, interstate commerce is often within the exclusive regulating power of Congress. Can it be asserted that the property of all persons or corporations engaged in such commerce is not the subject of taxation by the several States, because Congress may regulate interstate commerce? Conveyances, mortgages, leases, pledges, and, indeed, all property and the contracts

which arise from its ownership, are subject more or less to state regulation, exclusive in its nature.   If the proposition here contended for be sound, such property or dealings in relation thereto cannot be taxed by Congress, even in the form of a stamp duty. It cannot be doubted that the argument when reduced to its essence demonstrates its own unsoundness, since it leads to the necessary conclusion that both the National and state governments are divested of those powers of taxation which from the foundation of the government admittedly have belonged to them.   Certainly, a tax placed upon an inheritance or legacy diminishes, to the extent of the tax, the value of the right to inherit or receive, but this is a burden cast upon the recipient and not upon the power of the State to regulate.   This distinction shows the inapplicability to the case in hand of the statement made by Mr. Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, 431, "that the power to tax involves the power to destroy."   This principle is pertinent only when there is no power to tax a particular subject, and has no relation to a case where such right exists.   In other words, the power to destroy which may be the consequence of taxation is a reason why the right to tax should be confined to subjects which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope.   But this reasoning has no application to a lawful tax, for if it had there would be an end of all taxation; that is to say, if a lawful tax can be defeated because the power which is manifested by its imposition may when further exercised be destructive, it would follow that every lawful tax would become unlawful, and therefore no taxation whatever could be levied.   Under our constitutional system both the National and the state governments, moving in their respective orbits, have a common authority to tax many and diverse objects, but this does not cause the exercise of its lawful attributes by one to be a curtailment of the powers of government of the other, for if it did there would practically be an end of the dual system of government which the Constitution established.   The contention was adversely decided in the *License Tax Cases,*

*supra*, where (p. 470) the court said: " We come now to examine a more serious objection to the legislation of Congress in relation to the dealings in controversy. It was argued, for the defendants in error, that a license to carry on a particular business gives no authority to carry it on; that the dealings in controversy were parcel of the internal trade of the State in which the defendants resided; that the internal trade of a State is not subject, in any respect, to legislation by Congress, and can neither be licensed nor prohibited by its authority; that licenses for such trade, granted under acts of Congress, must, therefore, be absolutely null and void; and, consequently, that penalties for carrying on such trade without such license could not be constitutionally imposed." The court, after thus stating the argument, decided that the license was a mere form of excise taxation; that it conferred no right to carry on the business (the selling of lottery tickets and the liquor traffic) if forbidden to be engaged in by the State, but license was applicable whenever under the state law such business was permitted to be done. Many other opinions of this court have pointed out the error in the proposition relied on, and render it unnecessary to do more than refer to them. *Lane County v. Oregon,* 7 Wall. 71, 77; *Veazie Bank v. Fenno,* 8 Wall. 533, 547; *National Bank v. Commonwealth,* 9 Wall. 353, 362; *Collector v. Day,* 11 Wall. 113, 127; *United States v. Railroad Company,* 17 Wall. 322, 327; *Railroad Co. v. Peniston,* 18 Wall. 5, 36; *California v. Central Pacific Railroad Co.,* 127 U. S. 1, 40.

We are then brought to a consideration of the particular form of death duty, which is manifested by the statute under consideration. The sections embodying it are printed in the margin.[1]

---

[1] Act of June 13, 1898, ch. 448.

Sec. 29. That any person or persons having in charge or trust as administrators, executors or trustees, any legacies or distributive shares arising from personal property, where the whole amount of such personal property as aforesaid shall exceed the sum of $10,000 in actual value, passing, after the passage of this act, from any person possessed of such property, either by will or by the intestate laws of any State or Territory, or any personal property or interest therein, transferred by deed, grant, bargain, sale

It is at the outset obvious that the exact meaning of the statute is not free from perplexity, as there are clauses in it, when looked at apart from their context, which may give rise to conflicting views. It is plain, however, that the statute must mean one of three things:

---

or gift, made or intended to take effect in possession or enjoyment after the death of, the grantor or bargainor, to any person or persons, or to any body or bodies, politic or corporate, in trust or otherwise, shall be, and hereby are, made subject to a duty or tax, to be paid to the United States as follows, that is to say: Where the whole amount of said personal property shall exceed in value $10,000, and shall not exceed in value the sum of $25,000, the tax shall be—

*First.* Where the person or persons entitled to any beneficial interest in such property shall be the lineal issue or lineal ancestor, brother or sister to the person who died possessed of such property as aforesaid, at the rate of seventy-five cents for each and every $100 of the clear value of such interest in such property.

*Second.* Where the person or persons entitled to any beneficial interest in such property shall be the descendant of a brother or sister of the person who died possessed as aforesaid, at the rate of one dollar and fifty cents for each and every $100 of the clear value of such interest.

*Third.* Where the person or persons entitled to any beneficial interest in such property shall be the brother or sister of the father or mother, or a descendant of a brother or sister of the father or mother, of the persons so died possessed as aforesaid, at the rate of three dollars for each and every one hundred dollars of the clear value of such interest.

*Fourth.* Where the person or persons entitled to any beneficial interest in such property shall be the brother or sister of the grandfather or grandmother, or a descendant of the brother or sister of the grandfather or grandmother, of the person who died possessed as aforesaid, at the rate of four dollars for each and every hundred dollars of the clear value of such interest.

*Fifth.* Where the person or persons entitled to any beneficial interest in such property shall be in any other degree of collateral consanguinity than as hereinbefore stated, or shall be a stranger in blood to the person who died possessed as aforesaid, or shall be a body politic or corporate, at the rate of five dollars for each and every hundred dollars of the clear value of such interest: *Provided,* That all legacies or property passing by will, or by the laws of any State or Territory, to husband or wife of the person who died possessed as aforesaid, shall be exempt from tax or duty.

Where the amount or value of said property shall exceed the sum of $25,000, but shall not exceed the sum or value of $100,000, the rates of duty or tax above set forth shall be multiplied by one and one half, and where the amount or value of said property shall exceed the sum of $100,000, but

1. The tax which it imposes is on the passing of the whole amount of the personal estate, with a progressive rate depending upon the sum of the whole personal estate; or,

---

shall not exceed the sum of $500,000, such rates of duty shall be multiplied by two; and where the amount or value of said property shall exceed the sum of $500,000 but shall not exceed the sum of $1,000,000, such rates of duty shall be multiplied by two and one half; and where the amount or value of said property shall exceed the sum of $1,000,000, such rates of duty shall be multiplied by three.

Sec. 30. That the tax or duty aforesaid shall be a lien and charge upon the property of every person who may die as aforesaid for twenty years, or until the same shall, within that period, be fully paid to and discharged by the United States; and every executor, administrator or trustee, before payment and distribution to the legatees, or any parties entitled to beneficial interest therein, shall pay, to the collector or deputy collector of the district of which the deceased person was a resident, the amount of the duty or tax assessed upon such legacy or distributive share, and shall also make and render to the said collector or deputy collector a schedule, list or statement, in duplicate, of the amount of such legacy or distributive share, together with the amount of duty which has accrued or shall accrue thereon, verified by his oath or affirmation, to be administered and certified thereon by some magistrate or officer having lawful power to administer such oaths, in such form and manner as may be prescribed by the Commissioner of Internal Revenue, which schedule, list or statement shall contain the names of each and every person entitled to any beneficial interest therein, together with the clear value of such interest, the duplicate of which schedule, list or statement shall be by him immediately delivered, and the tax thereon paid to such collector; and upon such payment and delivery of such schedule, list or statement said collector or deputy collector shall grant to such person paying such duty or tax a receipt or receipts for the same in duplicate, which shall be prepared as hereinafter provided. Such receipt or receipts, duly signed and delivered by such collector or deputy collector, shall be sufficient evidence to entitle such executor, administrator or trustee to be credited and allowed such payment by every tribunal which, by laws of any State or Territory, is or may be empowered to decide upon and settle the accounts of executors and administrators. And in case such executor, administrator or trustee shall refuse or neglect to pay the aforesaid duty or tax to the collector or deputy collector as aforesaid, within the time hereinbefore provided, or shall neglect or refuse to deliver to said collector or deputy collector the duplicate of the schedule, list or statement of such legacies, property or personal estate under oath as aforesaid, or shall neglect or refuse to deliver the schedule, list or statement of such legacies, property or personal estate under oath as aforesaid, or shall deliver to said collector or deputy collector a false schedule or statement of such legacies, property or personal estate, or give the names and relationship of

2. The tax which it levies is placed on the passing of legacies or distributive shares of personal property at a progressive rate, the amount of such rate being determined, not by the separate sum of each legacy or distributive share, but by the volume of the whole personal estate. This is the mode in which the tax was computed by the assessor, and which was sustained by the court below; or,

3. The tax is on the passing of legacies or distributive shares

the persons entitled to beneficial interest therein untruly, or shall not truly and correctly set forth and state therein the clear value of such beneficial interest, or where no administration upon such property or personal estate shall have been granted or allowed under existing laws, the collector or deputy collector shall make out such lists and valuation as in other cases of neglect or refusal, and shall assess the duty thereon; and the collector shall commence appropriate proceedings before any court of the United States, in the name of the United States, against such person or persons as may have the actual or constructive custody or possession of such property or personal estate, or any part thereof, and shall subject such property or personal estate, or any portion of the same, to be sold upon the judgment or decree of such court, and from the proceeds of such sale the amount of such tax or duty, together with all costs and expenses of every description to be allowed by such court, shall be first paid, and the balance, if any, deposited according to the order of such court, to be paid under its direction to such person or persons as shall establish title to the same. The deed or deeds, or any proper conveyance of such property or personal estate, or any portion thereof, so sold under such judgment or decree, executed by the officer lawfully charged with carrying the same into effect, shall vest in the purchaser thereof all the title of the delinquent to the property or personal estate sold under and by virtue of such judgment or decree, and shall release every other portion of such property or personal estate from the lien or charge thereon created by this act. And every person or persons who shall have in his possession, charge or custody any record, file or paper containing, or supposed to contain, any information concerning such property or personal estate as aforesaid, passing from any person who may die as aforesaid, shall exhibit the same at the request of the collector or deputy collector of the district, and to any law officer of the United States, in the performance of his duty under this act, his deputy or agent, who may desire to examine the same. And if any such person, having in his possession, charge or custody any such records, files or papers, shall refuse or neglect to exhibit the same on request as aforesaid, he shall forfeit and pay the sum of $500: *Provided,* That in all legal controversies where such deed or title shall be the subject of judicial investigation, the recital in said deed shall be *prima facie* evidence of its truth, and that the requirements of the law had been complied with by the officers of the government.

of personalty, with a progressive rate on each, separately determined by the sum of each of such legacies or distributive shares.

On the very threshold, the theory that the tax is not on particular legacies or distributive shares passing upon a death, but is on the whole amount of the personal property of the deceased, is rebutted by the heading, which describes what is taxed, not as the estates of deceased persons, but as "legacies and distributive shares of personal property." This, whilst not conclusive, is proper to be considered in interpreting the statute, when ambiguity exists and a literal interpretation will work out wrong or injury. *United States* v. *Fisher*, 2 Cranch, 358, 386; *United States* v. *Palmer*, 3 Wheat. 610, 631; *United States* v. *Union Pacific Railroad*, 91 U. S. 72; *Smythe* v. *Fiske*, 23 Wall. 374, 380; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550.

The opening words of section 29 may, for clearness, be thus arranged :

" That any person or persons having in charge or trust, as administrators, executors or trustees, any legacies or distributive shares arising from personal property, . . . passing, after the passage of this act, from any person possessed of such property, either by will or by the intestate laws of any State or Territory, . . . shall be, and hereby are, made subject to a duty or tax, to be paid to the United States, as follows: that is to say," etc.

Thus collocated, the statute clearly imposes the duty on the particular legacies or distributive shares, and not on the whole personal estate. It does not say that the tax is levied on the personal estate left by the deceased person, but it is imposed on legacies or distributive shares arising from such property. This is made clearer by considering that in the very same section the tax is described as being upon " any interest which may have been transferred by deed, grant, bargain, sale or gift, made or intended to take effect in possession or enjoyment after the death of the grantor or bargainor, to any person or persons," etc. That is to say, whilst the law places the duty on any legacy or distributive share passing by death, it puts a like

burden on gifts which may have been made in contemplation of death and otherwise than by last will and testament.

Following the paragraph from which the foregoing has been quoted, the statute makes five distinct classes or enumerations, whereby the rate of the tax is varied, that is, it is made more or less, depending upon the relationship, or want of relationship, of the legatee or distributee to the deceased. But this enumeration can only be explained upon the hypothesis that the law intended to impose a greater or less tax upon a legatee or distributee, arising from his degree of relationship or his being a stranger in blood to the deceased. Thus it cannot be doubted that, in assessing the tax, the position of each separate legatee or distributee must be taken into view in order to ascertain the primary rate which the statute establishes. One of two things must arise. When the rate of tax is thus calculated upon the particular attitude to the deceased of each of the legatees or distributees, the sum of the tax must be deducted either from each particular legacy or from the mass of the whole personal estate. If it is deducted from each particular legacy, then it is manifest that the tax imposed will have been levied, not upon the mass of the estate, but upon each particular legatee or beneficiary, since the share of such person will have paid a rate of taxation predicated upon the amount of the legacy and the relationship, or want of relationship, of the particular recipient thereof to the deceased. This being the case, no room would be left for the contention that the tax was imposed on the whole estate. On the other hand, if the whole sum of the taxation on all the shares, calculated on the basis of the relationship of each beneficiary and the amount received, be deducted from the mass of the estate, then, each recipient would pay only a proportion of the amount without reference to his relationship to the deceased. This would result in imposing the tax on the whole personal estate, and ratably distribute the burden among all the beneficiaries. But to reach this the entire classification, grading the rate of the tax by the degrees of relationship, would have to be disregarded. The dilemma, therefore, which is involved in the contention that the statute imposes the tax, not on each legacy or distributive share, but on the whole personalty, is

this : If the tax is levied and collected according to the classifications in the statute, it is clearly on the legacy or distributive share. If, on the contrary, it is levied on the entire personal estate, then the classifications of the statute must be ignored and the construction be upheld which maintains that the act has classified the rate of tax by the relationship of the beneficiaries to the deceased, and has then disregarded the classification by collecting the tax wholly without reference to such relationship. This construction, besides eliminating a large portion of the text of the act, would do violence to its plain import, which is to make the rate of the tax depend upon the character of the links connecting those taking with the deceased. This is greatly fortified by other portions of the act. At the close of the fifth subdivision of section 29, one of the clauses creating a classification with respect to remote relationship, or want of relationship, to the deceased, it is provided as follows :

" *Provided,* That all legacies or property passing by will, or by the laws of any State or Territory, to husband or wife of the person died possessed as aforesaid, shall be exempt from tax or duty."

Now, mark, the word is " passing " by will, etc., which excludes a conception that the whole amount of the estate, and not the particular portions thereof which passed, is the subject of the tax. And the exemption, from the tax or duty, of the legacy, etc., given to the husband or wife of a deceased, implies that the scheme of taxation is of the legacies, etc., and not of the whole personal estate. This must be so, unless it can be said that the statute in terms exempts the legacy to a husband or wife from the legacy tax otherwise imposed, although no legacy taxes resulted from the statute.

The provisions for the collection of the tax contained in section 30 of the act confirm the construction that the passing of each legacy or distributive share, and not the entire personal estate of a deceased person, forms the subject of the tax. Thus, before payment and distribution to the legatees, etc., an executor, administrator or trustee is required to pay " the amount of the duty or tax assessed upon such legacy or distributive share,"

and to "make and render a schedule," etc., in duplicate, "of the amount of such legacy or distributive share, together with the amount of duty which has accrued, or shall accrue thereon," and the schedule is required to "contain the names of each and every person entitled to any beneficial interest therein."

Whatever be the obscurity it is illumined when the light of the previous legislation, which we have already reviewed, is thrown on it. The passing of legacies and distributive shares were the objects taxed under the English legacy act. They were the subjects taxed under the act of Congress of 1797. By the act of 1862, as we have seen, the whole estate was reached by a probate duty, whilst a distinct duty was charged upon legacies and distributive shares in personal property. When the act of 1864 was enacted there was added a succession tax on real estate, modeled, as said by this court and as shown by the act itself, upon the English Succession Duty Act, which treated each particular gift of real estate as a distinct succession, separately liable for the duty laid by the act. The legacy tax and the succession tax were thus co-related and rested upon the same theory; that is, both considered, they created a tax on the passing of each particular gift or distributive share of both the personal and real estate, treated as separate, one from the other, and each as forming a distinct estate subject to taxation. To assume that, when the succession duty was adopted in 1864, the legacy tax, which was also reënacted in that act, lost its character and became a tax levied, not on the passing of the legacies and distributive shares, but upon the whole amount of the estate before passing, would destroy the entire harmony of the system, and lead to a confession that a confusion of thought existed which cannot in reason be admitted. Indeed, it is difficult to conceive that the act of 1864 contemplated that either the legacy duty or the succession duty which it imposed should be upon the whole estate, since the tax to be paid by the whole estate was therein distinctly and separately provided for by means of the probate duty. If the tax on the whole estate can be, by implication, inserted, the same reasoning would also imply that the succession duty must be likewise treated. It would thus be that the entire act of 1864 would be in force despite its

repeal and the failure to reënact in the present law either the whole estate or succession duty.

What it was considered the act of 1864 levied the tax on is also in addition demonstrated by the amendments made to the act of 1864 in 1866. One of these amendments was: "That any legacy or share of personal property passing as aforesaid to a minor child of the person who died possessed as aforesaid shall be exempt from taxation under this section, unless such legacy or share shall exceed the sum of one thousand dollars, in which case the excess only above that sum shall be liable to said taxation." Another was that any tax paid under the provisions of sections 124 and 125 of the act of 1864 should "be deducted from the particular legacy or distributive share, on account of which the same is charged." In other words, the act expressly commanded that to be done, which it was impossible should be done compatibly with any hypothesis that the tax was on the whole personal estate, for, as we have seen, under that assumption the deduction of the tax from the whole estate was essential.

That the provisions of the act of 1864 were in mind when the present act was drafted is apparent, since it is not disputed that the act under review, so far as the tax on legacies and distributive shares is concerned, is an exact reproduction of the original act of 1864, except to the extent that the present act contains provisions relating to a progressive increase of rates. We say of the original act, because the present act does not contain in it the amendments to which we have referred, made in 1866; the fair inference being that the writer of the present act had before him the original text of the act of 1864, and not that text as amended by the act of 1866.

As the only provisions added to the present law relate to the progressive rate upon the legacies, it follows that, unless these added clauses provide for a tax on the whole estate instead of the legacies, it is a demonstration that the whole estate is not taxed by the present act. That the progressive rate features inserted in the act now under review have even no tendency to bring about such a result, we proceed now to demonstrate. We reproduce such portions of section 29 as are essential, putting in

brackets the words found in the act of 1898 under review, which were not contained in the corresponding provisions existing in the act of 1864:

"That any person or persons having in charge or trust, as administrators, executors or trustees, any legacies or distributive shares arising from personal property where the whole amount of such personal property as aforesaid shall exceed the sum of [ten] thousand dollars in actual value, passing, after the passage of this act, from any person possessed of such property, either by will or by the intestate laws of any State or Territory, or any personal property or interest therein, transferred by deed, grant, bargain, sale or gift, made or intended to take effect in possession or enjoyment after the death of the grantor or bargainor, to any person or persons, or to any body or bodies, politic or corporate, in trust or otherwise, shall be, and hereby are, made subject to a duty or tax to be paid to the United States, as follows, that is to say : [Where the whole amount of said personal property shall exceed in value ten thousand and shall not exceed in value the sum of twenty-five thousand dollars, the tax shall be :]"

Immediately following this are five classifications of beneficiaries, each varying in rate. These are followed by the progressive rate clause, which is as follows :

[" Where the amount or value of said property shall exceed the sum of twenty-five thousand dollars, but shall not exceed the sum or value of one hundred thousand dollars, the rates of duty or tax above set forth shall be multiplied by one and one-half, and where the amount or value of said property shall exceed the sum of one hundred thousand dollars, but shall not exceed the sum of five hundred thousand dollars, such rates of duty shall be multiplied by two ; and where the amount or value of such property shall exceed the sum of five hundred thousand dollars, but shall not exceed the sum of one million dollars, such rates of duty shall be multiplied by two and one-half ; and where the amount or value of such property shall exceed the sum of one million dollars, such rates of duty shall be multiplied by three."]

Observing closely the text, it is apparent that the clause

therein which points out what is taxed is an exact copy of the act of 1864, except the substitution of the " ten " for the word " one." The subject taxed, therefore, under the present act is the same which was taxed under the act of 1864. This is the equivalent of a mathematical certainty. Coming, then, to the added provision at the end of · the first paragraph, it says : " Where the whole amount of said personal property shall exceed in value," etc. This, however, creates no new object of taxation, but simply provides that where said personal property, that is, the property previously specified, exceeds a certain amount, a given rate shall be imposed. So, in the further addition, pointing out the progressive feature, the law says, " Where the amount or value of said property shall exceed the sum of," etc., thus clearly again referring to the objects of taxation, the property described in the first part of the act, which was identically the same thing described in the act of 1864. The demonstration, therefore, is conclusive that the progressive feature clause added in the present act creates no new subject of taxation ; it simply provides for the progressive rates on the said property mentioned in the opening sentences, which is described exactly as it was in the act of 1864. Now, as the act of 1864 taxed, not the whole estate, but each particular legacy or distributive share, the conclusion cannot be escaped that the present law does the same thing, except that there is added thereto a progressive rate.

The tax being then on the legacies and distributive shares, the rate primarily being determined by the relation of the legatees or distributees to the estate, does the law command that the progressive rate of tax which it imposes on the legacies or distributive shares shall be measured, not separately by the amount of each particular legacy or distributive share, but by the sum of the whole personal estate ? This, as we have said, is the interpretation of the act which was adopted by the assessor in levying the taxes under review, and which was sustained by the court below.

The unsoundness of the construction, that the act measures the rate of tax by the whole estate, is fully shown by what we have already said, for, as under the act of 1864 the legacies and

distributive shares alone were taxed, and as in reënacting it
the exact language was retained, (omitting the separate pro-
visions in the act of 1864, taxing the whole estate by a probate
duty and taxing successions,) and as the progressive rates only
refer to the object taxed, as provided in the act of 1864, it
results that under no reasonable construction can the present
act be held to provide for a rate of tax computed on the whole
estate. Even, however, if all the previous history be shut out
of view, and even if the omission from this act of the whole
estate duty which obtained under the act of 1864 be for the
moment forgotten, the text of the law, considered alone, would
not support the construction that it provides for a tax upon
each legacy and distributive share by a rate of tax measured by
the whole estate. In order to make this clear we will briefly
analyze the text. In doing so, however, we eliminate the at-
tempt made by counsel in argument to show the significance
thereof by expressions used in the course of the debate by cer-
tain members of the Senate. *Maxwell* v. *Dow*, 176 U. S. 581,
and cases there cited.

The meaning of the act largely turns upon the following words,
contained in the opening paragraph of section 29 : " Where
the whole amount of such personal property as aforesaid shall
exceed the sum of ten thousand dollars in actual value, passing,"
etc. If these words refer to the whole amount of the estate
left by a deceased person, then the words added in the act of
1898, to the end of the paragraph, viz., " where the whole amount
of *said* personal property shall exceed in value ten thousand,
and shall not exceed in value the sum of twenty-five thousand
dollars, the tax shall be," as stated in five classifications next
enumerated, must refer to the same thing. It follows likewise
that the progressive rate clause, which says, " where the amount
or value of *said* property shall exceed the sum of," etc., must
relate to the same thing; that is, the whole amount of the
estate, as stated in the opening sentences of section 29. If this
view be correct, then all legacies in an estate of ten thousand
dollars are exempt, and all legacies, whatever be their amount,
in an estate above ten thousand dollars, have the original rate
adjusted according to the classifications, and that rate is in-

creased progressively by the whole amount of the estate, and not by the amount of the legacy. If, on the other hand, the words " where the whole amount of such personal property as aforesaid shall exceed the sum of ten thousand dollars," found in the first sentence of section 29, relate to the whole amount of each legacy, then legacies under ten thousand dollars are not taxable, and those above ten thousand pay the original rate provided in the classifications, and become subject to the progressive increase clause, according to the amount of the legacy, and not by the whole amount of the estate.

But the pivotal words in the first sentence are not simply " the whole amount of such personal property," but the " whole amount of such personal property *as aforesaid*." This can only refer to the preceding part of the sentence, where what is contemplated by the words " *as aforesaid* " is and can alone be " *any* legacies or distributive shares arising from personal property . ⁚ . passing after the passage of this act." In other words, the statute itself by the reference clause establishes that the whole amount referred to is the sum or value of each particular legacy, etc., separately considered, passing from the deceased to the taker thereof. And this construction of the vital words referred to, derived from what immediately precedes them, is sustained by what immediately follows them, that is, the clause imposing the tax on " any personal property or interest therein, transferred by deed," etc., " made or intended to take effect in possession or enjoyment after the death of the grantor or bargainor, to any person or persons," etc. This latter clause treats each item of property given in contemplation of death otherwise than by last will and testament, as a distinct entity to be considered for the purpose of levying the tax. Each of such items, therefore, separately considered, becomes for the purpose of the tax, the whole amount of such personal property, the statute clearly recognizing that there may be partial and distinct interests in each item of personal property, such as an interest for life in one person with a remainder in another. Thus by the two clauses, which are linked together by the words " the whole amount of such personal property," it develops that the amount referred to is the separate and distinct

sums or items of personal property passing, and not the whole
amount of the entire estate, which, as has been shown in con-
sidering the previous proposition, the act did not purport to tax
as such.

The subsequent provisions of the act lend cogency to this
view    Thus, in section 30, it is made the duty of the executor,
etc., to pay over to the collector " the amount of the duty or
tax assessed upon *such* legacy or distributive share," and he is
also commanded to deliver to the collector a schedule " of the
amount of *such* legacy or distributive share, together with the
amount of the duty which has accrued or shall acrue thereon."

At the risk of repetition, we recur again to a particular fea-
ture in the prior legislation, because it very pertinently points
out the error which has given rise to the assumption that the
" whole personal estate as aforesaid " meant in the act of 1864,
or means in this act, the whole amount of the personal estate
left by the deceased, and not the whole amount of each legacy
considered as a separate estate for the purpose of taxation. At-
tention has been called to the fact that, in accordance with the
English system, the act of 1864 engrafted on the provisions of
the act of 1862 a succession or real estate inheritance tax. In
doing so, it was unequivocally declared in the law that each
separate gift of real property was a distinct succession or es-
tate. In other words, the statute itself announced the rule that
the whole amount of each estate subject to taxation, under the
succession tax, was the whole amount of each separate item of
gift treated as an estate for the purpose of the levy and collec-
tion of the taxes thereon. How, then, can it be supposed that
the act of 1864 contemplated that the section relating to the
legacy should have one meaning, whilst the whole amount of
the estate in the sections relating to succession or real estate
taxes should have another ? Must it not be considered that the
statute provided for no such discordant and unjust discrimina-
tion, but that, on the contrary, it harmoniously expressed the
rule obtaining from the beginning, that is, the levy of a legacy
tax on personal estate passing by death to each particular bene-
ficiary treated separately as the amount subject to taxation and
the same rule applied to the succession tax by treating each

item of real estate as the whole amount of an estate passing separately for the purpose of taxation?

It is true that in the practical execution of the act of 1864 the words " the whole amount of such personal property . . . shall exceed the sum of one thousand dollars " were administratively construed as applying to the entire personal estate left by one deceased, and not to the distinct legacies or interests. It resulted that where an estate did not equal one thousand dollars, no tax was collected upon legacies or distributive shares therein, and where the estate exceeded one thousand dollars all legacies and distributive shares, whatever the amount of each, were taxed. Any force resulting from this administrative view, however, is weakened by the fact that the contrary construction prevailed as' to the other portions of the act of 1864, the succession duty, where the amount of the tax was determined by the amount or value of each particular item of real property. The administrative construction therefore of the act of 1864 was contradictory, since it enforced one rule on the one hand and an absolutely conflicting one on the other. Besides, the whole estate was taxed as such by the probate duty found in the act of 1864.

As we have said, the act of 1864 was repealed in 1870. 16 Stat. 256. After the repeal, the court was called upon, in *Mason* v. *Sargent*, 104 U. S. 689, to consider whether, when one who held a life estate in a legacy died subsequent to the repeal of the act, the interest of the legatees in remainder was subject to the inheritance tax. In passing upon this question this court said (p. 690):

" The tax in question was imposed by sec. 124 of the act of June 30, 1864, c. 173, (13 Stat. 223, 285,) upon legacies or distributive shares of personal property exceeding the sum of $1000, passing, after the passage of the act, from a decedent, either testate or intestate, in the hands of an executor, administrator or trustee, varying in rate, as the party beneficially entitled was less or more remote in consanguinity, or a stranger in blood, to the person from whom it passed ; with a proviso that legacies or distributive interests in intestate estates, passing to husband or wife, should be exempt from such tax."

The opinion thus expressed is in conflict with the assumption that the whole estate contemplated, not each legacy or distributive share, but the entire amount of personal property of the deceased, and this construction may be well considered to have been in effect adopted by the reënactment of the act of 1864, without any change indicating an intention to the contrary.

Granting, however, that there is doubt as to the construction, in view of the consequences which must result from adopting the theory that the act taxes each separate legacy by a rate determined, not by the amount of the legacy, but by the amount of the whole personal estate left by the deceased, we should be compelled to solve the doubt against the interpretation relied on. The principle on which such construction rests was thus defended in argument. The tax is on each separate legacy or distributive share, but the rate is measured by the whole estate. In other words, the construction proceeds upon the assumption that Congress intended to tax the separate legacies, not by their own value, but by that of a wholly distinct and separate thing. But this is equivalent to saying that the principle underlying the asserted interpretation is that the house of A, which is only worth one thousand dollars, may be taxed, but that the rate of the tax is to be determined by attributing to A's house the value of B's house, which may be worth a hundredfold the amount. The gross inequalities which must inevitably result from the admission of this theory are readily illustrated. Thus, a person dying, and leaving an estate of $10,500, bequeaths to a hospital ten thousand dollars. The rate of tax would be five per cent, and the amount of tax five hundred dollars. Another person dies at the same time, leaves an estate of one million dollars, and bequeaths ten thousand dollars to the same institution. The rate of tax would be $12\frac{1}{2}$ per cent, and the amount of the tax $1250. It would thus come to pass that the same person, occupying the same relation, and taking in the same character, two equal sums from two different persons, would pay in the one case more than twice the tax that he would in the other. In the arguments of counsel tables are found which show how inevitable and profound are the inequalities which the construc-

tion must produce. Clear as is the demonstration which they make, they only serve to multiply instances afforded by the one example which we have just given.

We are, therefore, bound to give heed to the rule, that where a particular construction of a statute will occasion great inconvenience or produce inequality and injustice, that view is to be avoided if another and more reasonable interpretation is present in the statute. *Bate Refrigerating Co.* v. *Sulzeberger,* 157 U. S. 1, 37; *Wilson* v. *Rousseau,* 4 How. 646, 680; *Bloomer* v. *McQuewan,* 14 How. 539, 553; *Blake* v. *National Banks,* 23 Wall. 307, 320; *United States* v. *Kirby,* 7 Wall. 482, 486. Indeed, the confusion which gives rise to both of the constructions of the statute which we have just considered comes from the want of insight pointed out by Hanson in a passage which we have heretofore quoted; that is, it arises from not keeping in mind the distinction between a tax on the interest to which some person succeeds on a death and a tax on the interest which ceased by reason of the death, the two being different objects of taxation.

It may be doubted by some, aside from express constitutional restrictions, whether the taxation by Congress of the property of one person, accompanied with an arbitrary provision that the rate of tax shall be fixed with reference to the sum of the property of another, thus bringing about the profound inequality which we have noticed, would not transcend the limitations arising from those fundamental conceptions of free government which underlie all constitutional systems. On this question, however, in any of its aspects, we do not even intimate an opinion, as no occasion for doing so exists, since, as we understand the law, we are clearly of opinion that it does not sustain the construction which was placed on it by the court below.

By elimination, the process of reasoning which we have resorted to in order to demonstrate the unsoundness of the two first contentions as to the meaning of the statute renders it unnecessary to say anything in elaboration of the significance of the statute as embodied in the third proposition, which is, that the tax is on the legacies and distributive shares, the rate being primarily determined by the classifications and being progres-

sively increased according to the amount of the legacies or shares. Its correctness is at once apparent when the other views are disposed of. As the " whole amount of such personal property as aforesaid " relates to the sum of each legacy or distributive share considered separately, it follows that all legacies not exceeding ten thousand dollars are not taxed, and that those above that amount are taxed primarily by the degree of relationship or absence thereof, specified in the five classifications contained in the statute, and that the rate of tax is progressively increased by the amount of each separate legacy or distributive share. This being the correct interpretation of the statute, it follows that the court below erroneously maintained a contrary construction, and, therefore, the tax assessed and collected was for a larger amount than the sum actually due by law.

The precise meaning of the law being thus determined, the question whether the tax which it imposes is direct, and hence subject to the requirement of apportionment, arises for consideration. That death duties, generally, have been from the beginning in all countries considered as different from taxes levied on property, real or personal, directly on account of the ownership and possession thereof, is demonstrated by the review which we have previously made. It has also been established by what we have heretofore said, that such taxes, almost from the beginning of our national life, have been treated as duties, and not as direct taxes. Of course, they concern the passing of property by death, for if there was no property to transmit, there would be nothing upon which the tax levied on the occasion of death could be computed. This legislative and administrative view of such taxes has been directly upheld by this court. In *Scholey* v. *Rew*, 23 Wall. 331, 349, to which we have heretofore referred, the question presented was the constitutionality of the provisions of the act of 1864, imposing a succession duty as to real estate. The assertion was that the duty was repugnant to the Constitution, because it was a direct tax and had not been apportioned. The tax was decided to be constitutional. The court said (p. 346):

" But it is clear that the tax or duty levied by the act under consideration is not a direct tax within the meaning of either of

these provisions. Instead of that it is plainly an excise tax or duty, authorized by section eight of article one, which vests the power in Congress to lay and collect taxes, duties, imposts, and excises to pay the debts and provide for the common defence and general welfare.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

" Whether direct taxes in the sense of the Constitution comprehend any other tax than a capitation tax and a tax on land, is a question not absolutely decided, nor is it necessary to determine it in the present case, as it is expressly decided that the term does not include the tax on income, which cannot be distinguished in principle from a succession tax such as the one involved in the present controversy."

This is decisive against the contrary contention here relied on, unless it be that the decision in *Scholey* v. *Rew* has been overruled, and therefore is no longer controlling.

The argument is that the decision in *Scholey* v. *Rew* was overruled in *Pollock* v. *Farmers' Loan & Trust Company*, 157 U. S. 429; 158 U. S. 601. This contention is thus supported in argument.

As in the course of the opinion in *Scholey* v. *Rew* the court said that taxes on successions could not be distinguished in principle from an income tax, therefore the decision in the *Pollock* case, which held that an income tax was direct, it is argued, necessarily decided that an inheritance tax was also direct. But in the *Pollock* case the decision in *Scholey* v. *Rew* was not overruled. On the contrary, the correctness of the decision in the latter case as to the particular matter which it actually decided in effect was reaffirmed. In consequence of the statement made in *Scholey* v. *Rew*, that an income tax and a succession tax could not be distinguished one from the other, that case was relied on in the *Pollock* case by counsel in argument and by the members of the court who dissented, as establishing, for the reason stated, that the income tax was not direct. The court, however, treated *Scholey* v. *Rew* as inapplicable to an income tax, because it considered that whether an income tax was direct was not actually involved in the latter case, and hence the illustration which was used in *Scholey* v. *Rew* as to

an income tax was held not to have been a decision on the question of whether or not an income tax was direct.

The court said (157 U. S. 577):

"*Scholey* v. *Rew*, 23 Wall. 331, was the case of a succession tax, which the court held to be 'plainly an excise tax or duty' upon the devolution of the estate or the right to become beneficially entitled to the same, or the income thereof, in possession or expectancy. It was like the succession tax of a State, held constitutional in *Mager* v. *Grima*, 8 How. 490; and the distinction between the power of a State and the power of the United States to regulate the succession of property was not referred to, and does not appear to have been in the mind of the court. The opinion stated that the act of Parliament, from which the particular provision under consideration was borrowed, had received substantially the same construction, and cases under that act hold that a succession duty is not a tax upon income or upon property, but on the actual benefit derived by the individual, determined as prescribed. *In re Elwes*, 3 H. & N. 719; *Attorney General* v. *Sefton*, 2 H. & C. 362; *S. C.* (H. L.) 3 H. & C. 1023; 11 H. L. Cas. 257."

The argument now made, therefore, comes to this: Although in the *Pollock* case the doctrine which the court considered as having been actually decided in *Scholey* v. *Rew* was not overruled, nevertheless, because an example which was made use of in the course of the opinion in *Scholey* v *Rew* was disregarded, the *Pollock* case therefore overruled *Scholey* v. *Rew*. The issue presented in the *Pollock* case was whether an income tax was direct within the meaning of the Constitution. The contentions which the case involved were thus presented. On the one hand, it was argued that only capitation taxes and taxes on land as such were direct, within the meaning of the Constitution, considered as a matter of first impression, and that previous adjudications had construed the Constitution as having that import. On the other hand, it was asserted that, in principle, direct taxes, in the constitutional sense, embraced not only taxes on land and capitation taxes, but all burdens laid on real or personal property because of its ownership, which were equivalent to a direct tax on such property, and it was affirmed that the pre-

vious adjudications of this court had settled nothing to the contrary. The issues which were thus presented in the *Pollock* case, it will be observed, had been expressly reserved in *Scholey* v. *Rew*, where it was said (23 Wall. 346):

"Whether direct taxes in the sense of the Constitution comprehend any other tax than a capitation tax and a tax on land, is a question not absolutely decided, nor is it necessary to determine it in the present case."

The question which was thus reserved in *Scholey* v. *Rew*, and which was presented for decision in the *Pollock* case, was decided in the latter case, the court holding that taxes on the income of real and personal property were the legal equivalent of a direct levy on the property from which the income was derived, and therefore required apportionment. But there was no intimation in the *Pollock* case that inheritance taxes—which had been held in *Scholey* v. *Rew* not to be direct, which had from all time been considered as being imposed not on property, real or personal, as ordinarily understood, but as being levied on the transmission or receipt of property occasioned by death, and which had from the foundation of the government been treated as a duty or excise—were direct taxes within the meaning of the Constitution. Undoubtedly, in the course of the opinion in the *Pollock* case, it was said that, if a tax was direct within the constitutional sense, the mere erroneous qualification of it as an excise or duty would not take it out of the constitutional requirement as to apportionment. But this language related to the subject-matter under consideration, and was but a statement that a tax which was in itself direct, because imposed upon property solely by reason of its ownership, could not be changed by affixing to it the qualification of excise or duty. Here we are asked to decide that a tax is a direct tax on property which has at all times been considered as the antithesis of such a tax; that is, has ever been treated as a duty or excise, because of the particular occasion which gives rise to its levy.

But it is asserted that it was decided in the income tax cases that, in order to determine whether a tax be direct within the meaning of the Constitution, it must be ascertained whether the

one upon whom by law the burden of paying it is first cast, can thereafter shift it to another person. If he cannot, the tax would then be direct in the constitutional sense, and, hence, however obvious in other respects it might be a duty, impost or excise, it cannot be levied by the rule of uniformity and must be apportioned. From this assumed premise it is argued that death duties cannot be shifted from the one on whom they are first cast by law, and therefore they are direct taxes requiring apportionment.

The fallacy is in the premise. It is true that in the income tax cases the theory of certain economists by which direct and indirect taxes are classified with reference to the ability to shift the same was adverted to. But this disputable theory was not the basis of the conclusion of the court. The constitutional meaning of the word direct was the matter decided. Considering that the constitutional rule of apportionment had its origin in the purpose to prevent taxes on persons solely because of their general ownership of property from being levied by any other rule than that of apportionment, two things were decided by the court: First, that no sound distinction existed between a tax levied on a person solely because of his general ownership of real property, and the same tax imposed solely because of his general ownership of personal property. Secondly, that the tax on the income derived from such property, real or personal, was the legal equivalent of a direct tax on the property from which said income was derived, and hence must be apportioned. These conclusions, however, lend no support to the contention that it was decided that duties, imposts and excises which are not the essential equivalent of a tax on property generally, real or personal, solely because of its ownership, must be converted into direct taxes, because it is conceived that it would be demonstrated by a close analysis that they could not be shifted from the person upon whom they first fall. The proposition now relied upon was considered and refuted in *Nicol* v. *Ames*, 173 U. S. 509, 515, where the court said:

"The commands of the Constitution in this, as in all other respects, must be obeyed; direct taxes must be apportioned, while indirect taxes must be uniform throughout the United

States. But while yielding implicit obedience to these constitutional requirements, it is no part of the duty of this court to lessen, impede or obstruct the exercise of the taxing power by merely abstruse and subtle distinctions as to the particular nature of a specified tax, where such distinction rests more upon the differing theories of political economists than upon the practical nature of the tax itself.

" In deciding upon the validity of a tax with reference to these requirements, no microscopic examination as to the purely economic or theoretical nature of the tax should be indulged in for the purpose of placing it in a category which would invalidate the tax. As a mere abstract, scientific or economical problem, a particular tax might possibly be regarded as a direct tax, when as a practical matter pertaining to the actual operation of the tax it might quite plainly appear to be indirect. Under such circumstances, and while varying and disputable theories might be indulged as to the real nature of the tax, a court would not be justified, for the purpose of invalidating the tax, in placing it in a class different from that to which its practical results would consign it. Taxation is eminently practical, and is, in fact, brought to every man's door, and for the purpose of deciding upon its validity a tax should be regarded in its actual, practical results, rather than with reference to those theoretical or abstract ideas whose correctness is the subject of dispute and contradiction among those who are experts in the science of political economy."

Concluding, then, that the tax under consideration is not direct within the meaning of the Constitution, but, on the contrary, is a duty or excise, we are brought to consider the question of uniformity.

The contention is that because the statute exempts legacies and distributive shares in personal property below ten thousand dollars, because it classifies the rate of tax according to the relationship or absence of the relationship of the taker to the deceased, and provides for a rate progressing by the amount of the legacy or share, therefore the tax is repugnant to that portion of the first clause of section 8 of article 1 of the Constitu-

tion, which provides "the duties, imposts and excises shall be uniform throughout the United States."

The argument to the contrary, whilst conceding that the tax devised by the statute does not fulfill the requirement of equality and uniformity, as those words are construed when found in state constitutions, asserts that it does not thereby follow that the taxes in question are repugnant to the Constitution of the United States, since the provision in the Constitution, that "duties, imposts and excises shall be uniform throughout the United States," it is insisted has a different meaning from the expression equal and uniform, found in state constitutions. In order to decide these respective contentions it becomes at the outset necessary to accurately define the theories upon which they rest.

On the one side, the proposition is that the command that duties, imposts and excises shall be uniform throughout the United States relates to the inherent and intrinsic character of the tax; that it contemplates the operation of the tax upon the property of the individual taxpayer, and exacts that when an impost, duty or excise is levied, it shall operate precisely in the same manner upon all individuals; that is to say, the proposition is that "uniform throughout the United States" commands that excises, duties and imposts, when levied, shall be equal and uniform in their operation upon persons and property in the sense of the meaning of the words equal and uniform, as now found in the constitutions of most of the States of the Union. The contrary construction is this: That the words "uniform throughout the United States" do not relate to the inherent character of the tax as respects its operation on individuals, but simply requires that whatever plan or method Congress adopts for laying the tax in question, the same plan and the same method must be made operative throughout the United States; that is to say, that wherever a subject is taxed anywhere, the same must be taxed everywhere throughout the United States, and at the same rate. The two contentions then may be summarized by saying that the one asserts that the Constitution prohibits the levy of any duty, impost or excise which is not intrinsically equal and uniform in its opera-

tion upon individuals, and the other that the power of Congress in levying the taxes in question is by the terms of the Constitution restrained only by the requirement that such taxes be geographically uniform.

The argument as to intrinsic uniformity is asserted to find support in expressions used by some of the Justices in the carriage tax case, *Hylton* v. *United States*, 3 Dall. 171. The statements thus referred to are as follows:

Mr. Justice Paterson said (p. 180):

" Apportionment is an operation on States, and involves valuations and assessments, which are arbitrary, and should not be resorted to but in case of necessity. Uniformity is an instant operation on individuals, without the intervention of assessments, or any regard to States, and is at once easy, certain and efficacious."

Mr. Justice Iredell said (p. 181):

" If it can be considered as a tax, neither direct within the meaning of the Constitution, nor comprehended within the term duty, impost or excise, there is no provision in the Constitution, one way or another, and then it must be left to such an operation of the power, as if the authority to lay taxes had been given generally in all instances, without saying whether they should be apportioned or uniform ; and in that case, I should presume, the tax ought to be uniform, because the present Constitution was particularly intended to affect individuals, and not States, except in particular cases specified. And this is the leading distinction between the Articles of Confederation and the present Constitution."

And the following passage from the opinion in *United States* v. *Singer*, 15 Wall. 111, 121, is also asserted to support the contention that a tax was imposed upon a distiller, in the nature of an excise, and the question arose whether in its imposition upon different distillers the uniformity of the tax was preserved, and the court said:

" The law is not in our judgment subject to any constitutional objection. The tax imposed upon the distiller is in the nature of an excise, and the only limitation upon the power of Congress in the imposition of taxes of this character is that they

shall be uniform throughout the United States. The tax here is uniform in its operation; that is, it is assessed equally upon all manufacturers of spirits, wherever they are. The law does not establish one rule for one distiller and a different rule for another, but the same rule for all alike."

In opposition to this view it is urged that the language used by the Judges in the *Hylton* case was not intended to and does not, when properly understood, refer to the inherent character of the tax, but simply called attention to the fact that, differing from the Articles of Confederation, power was given to Congress by the Constitution to levy duties, imposts and excises, thus acting upon individuals; and that the language in the *Singer* case, whilst it uses the word equal, clearly referred, not to an inherent uniformity, but to a geographical one. And this, it is argued, is rendered certain by the opinion in the *Head Money cases,* 112 U. S. 580, 594, where, in considering the objection that a tax imposed upon the owners of steam vessels for each passenger landed at New York from a foreign port, was void because not levied by any rule of uniformity, the court, speaking by Justice Miller, said :

" The tax is uniform when it operates with the same force and effect in every place where the subject of it is found. The tax in this case, which, as far as it can be called a tax, is an excise duty on the business of bringing passengers from foreign countries into this by ocean navigation, is uniform, and operates precisely alike in every port of the United States, where such passengers can be landed."

To overcome the construction in favor of geographical uniformity asserted by the government to arise from the language just quoted, it is, in the first place, argued that when correctly understood, it does not sustain the claim so based on it, and in the second place, that if it does, it is not binding as authority, because the *Head Money* cases involved, not the uniformity clause of the Constitution, but that portion of clause 6 of section 9 of article 1 of the Constitution, which declares that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another."

It is conceded that if the preference clause just referred to

and the uniform clause have the same meaning, that of course merely a geographical operation was intended. But it is insisted that the two clauses are distinct in import, and that the difference in language of the two manifests the distinct meanings which should be affixed to them. It is apparent that the controversy cannot be disposed of by a mere reference to prior adjudications, since reliance is, by both sides, in effect, placed upon the same decisions. But to determine which view of the cited authorities is the correct one, it will become necessary not only to analyze the facts which were at issue in the decided cases, but also to elucidate the language of the opinions which have given rise to the conflicting constructions now placed upon such language, by an examination of the subjects to which the language related. As to do this calls for a critical consideration of the provisions of the Constitution referred to in the opinions relied on, we shall, for the moment, put the cases referred to out of mind, and consider the controversy presented as one of original impression. We are, moreover, impelled to this course from the fact that as the word " uniform," or the words " equal and uniform," are now generally found in state constitutions, and as there contained have been with practical unanimity interpreted by state courts as applying to the intrinsic nature of the tax and its operation upon individuals, if it be that the words " uniform throughout the United States," as contained in the Constitution of the United States, have a different significance, the reason for such conclusion should be carefully and accurately stated.

Considering the text, it is apparent that if the word " uniform " means " equal and uniform " in the sense now asserted by the opponents of the tax, the words " throughout the United States " are deprived of all real significance, and sustaining the contention must hence lead to a disregard of the elementary canon of construction which requires that effect be given to each word of the Constitution.

Taking a wider view, it is to be remembered that the power to tax contained in section 8 of article 1 is to lay and collect " taxes, duties, imposts and excises. . . . But all duties, imposts and excises shall be uniform throughout the United

States." Thus, the qualification of uniformity is imposed, not upon all taxes which the Constitution authorizes, but only on duties, imposts and excises. The conclusion that inherent equality and uniformity is contemplated involves, therefore, the proposition that the rule of intrinsic uniformity is applied by the Constitution to taxation by means of duties, imposts and excises, and it is not applicable to any other form of taxes. It cannot be doubted that in levying direct taxes, after apportioning the amount among the several States, as provided in clause 4 of section 9 of article 1 of the Constitution, Congress has the power to choose the objects of direct taxation, and to levy the quota as apportioned directly upon the objects so selected. Even then, if the view of inherent uniformity be the true one, none of the taxes so levied would be subjected to such rule, as the requirement only relates to duties, imposts and excises.

But the classes of taxes termed duties, imposts and excises, to which the rule of uniformity applies, are those to which the principle of equality and uniformity in the sense claimed, is in the nature of things the least applicable and least susceptible of being enforced. Excises usually look to a particular subject, and levy burdens with reference to the act of manufacturing them, selling them, etc. They are or may be as varied in form as are the acts or dealings with which the taxes are concerned. Impost duties take every conceivable form, as may by the legislative authority be deemed best for the general welfare. They have been at all times often specific. They have sometimes been discriminatory, particularly when deemed necessary by reason of the tariff legislation of other countries. The claim of intrinsic uniformity, therefore, imputes to the framers a restriction as to certain forms of taxes, where the restraint was least appropriate and the omission where it was most needed. This discord which the construction, if well founded, would create, suggests at once the unsoundness of the proposition, and gives rise to the inference that the contrary view by which the unity of the provisions of the Constitution is maintained, must be the correct one. In fact, it is apparent that if imposts, duties and excises are controlled by the rule of intrinsic uniformity, the methods usually employed at the time of the adoption of the

Constitution in all countries in the levy of such taxes would have to be abandoned in this country, and, therefore, whilst nominally having the authority to impose taxes of this character, the power to do so would be virtually denied to Congress.

Now, that the requirement that direct taxes should be apportioned among the several States, contemplated the protection of the States, to prevent their being called upon to contribute more than was deemed their due share of the burden, is clear. Giving to the term uniformity as applied to duties, imposts and excises a geographical significance, likewise causes that provision to look to the forbidding of discrimination as between the States, by the levying of duties, imposts or excises upon a particular subject in one State and a different duty, impost or excise on the same subject in another; and therefore, as far as may be, is a restriction in the same direction and in harmony with the requirement of apportionment of direct taxes. And the conclusion that the possible discrimination against one or more States was the only thing intended to be provided for by the rule which uniformity imposed upon the power to levy duties, imposts and excises, is greatly strengthened by considering the state of the law in the mother country and in the colonies, and the practice of taxation which obtained at or about the time of the adoption of the Constitution.

In England, nowhere had the conception of a limitation on the power to levy duties, imposts and excises by an intrinsic rule of uniformity found utterance, and the practice which had obtained, it may be said, was commonly to the contrary. Passing without special notice the system of customs (import and export) duties existing in England from a time long prior to the Revolution, which was replete with examples of taxation not fulfilling the requirement of intrinsic equality and uniformity, we briefly refer to a few examples of the same nature afforded by statutes imposing internal taxation in the mother country.

Internal taxation, in the form of excises, was introduced into England by a Parliamentary resolution passed on March 28, 1643, and carried into effect by an ordinance of the same date. 2 Dowell, History of Taxation, 9. Many of these excises were imposed with reference to the supposed ability of the

party whose property, office, etc., was assessed to pay the same. Thus, in 1747, a duty of excise was imposed upon coaches and other carriages kept for personal use. 20 Geo. II, ch. 10; 7 Stat. 15. In 1756 a duty of excise was imposed upon the possessor of plate over a certain weight. 29 Geo. II, ch. 14; 7 Stat. 661. In 1758 all offices of profit, other than naval and military, were subjected to the payment of duty *when the salary exceeded one hundred pounds.* 31 Geo. II 1257, 8 Stat. 212, ch. 22. In 1777 a duty was imposed upon employers of coachmen and other men servants. 17 Geo. III, ch. 39; 13 Stat. 103. In 1779 a duty was imposed, not upon all forms of locomotion, but upon traveling by post, the usual method of locomotion among the wealthier classes. 19 Geo. III, ch. 51; 13 Stat. 414. In 1784 a duty was laid, not uniformly with respect to all horses kept by a person, but in respect to horses kept for the saddle or driving in carriages. 24 Geo. III, ch. 31; 14 Stat. 496.

It is accurate to say that in the colonies prior to the Confederation, and in the States prior to the time of the adoption of the Constitution, the wisdom of restraining the levy of duties, imposts and excises by an express requirement of inherent equality and uniformity had likewise nowhere found expression. The state constitutions of the revolutionary period (except, perhaps, those of Massachusetts and New Hampshire) contained no provisions indicating an intent to control the bodies authorized to levy taxes and raise money in the exercise of a sound discretion as to the mode to be adopted in levying taxation. The people were content to commit to their representatives the enactment of reasonable and wholesome laws, being satisfied with the protection afforded by a representative and free government and by the general principles of the common law protecting the inalienable rights of life, liberty and property.

The Massachusetts constitution of 1780 and that of 1788 of New Hampshire merely required that the assessments of rates and taxes should be proportional and reasonable and with a view to equality, but there was no such qualification expressed as to the authority conferred " to impose and levy reasonable duties and excises upon any produce, goods, wares, merchandise

and commodities whatsoever, brought into, produced, manufactured or being within the same."

In taxing laws of the original States prior to the Convention of 1787, exemptions were allowed from a consideration of what was deemed best for the general welfare, and taxes were frequently laid from a consideration of the presumed ability of the owner to pay the tax. Discriminations and exemptions were also contained in various state taxing laws, which illustrate the discretion vested in the legistative bodies of the States in the latter part of the eighteenth century. We print in the margin a few examples.[1]

---

[1] In chapter 5 of the Pennsylvania Statutes, of March 27, 1782, a tax was laid upon " Negro and mulatto servants above the age of twelve years; horses, mares and cattle, above three years old; coaches and carriages kept by any person for his or her own use, and for the purpose of traveling or pleasure." The chaises or riding chairs of ministers of the gospel, the president, professors or tutors of Harvard College, or grammar school masters, were exempt from duty of excises laid upon certain described coaches and other carriages, by an act passed in Massachusetts on July 10, 1783.

In a law of 1784, at page 131, of the Laws of Connecticut, the listers were required in the list of polls and ratable assets of the inhabitants of the respective counties to list polls from 21 to 70 years of age at eighteen pounds, and polls from 16 to 21 years old at nine pounds; houses were to be listed, not uniformly, but according to the number of fireplaces; attorneys at law and physicians and surgeons were to be listed, the least practitioner at a certain sum, and larger practitioners higher in proportion; shopkeepers or traders, the lowest class at twenty-five pounds, and all others in due proportion; and each allowed and licensed tavern keeper was to be set at fifteen pounds, and to be added to in proportion to their situation and profits, according to the best judgment of the listers; and persons following any " mechanical art or mystery, such as blacksmiths, shoemakers, tanners, goldsmiths, or silversmiths," and all other works and occupations followed or pursued by any persons by which profits arise, except business in any public office, husbandry and common labor for hire, were to be assessed by the best judgment of the listers.

The general assembly of New Jersey, by the act (ch. 400) December 22, 1783, for the purpose of raising ten thousand pounds for the support of government and the contingent expenses for the year 1784, enumerated a large number of items of persons and articles which were made taxable by the act, to be valued and rated by the assessors within stated sums. Single men who kept a horse were to be rated at not exceeding ten shillings, while single men who did not keep a horse were to be rated at not exceeding five

It cannot be, therefore, supposed that the framers of the Constitution, in using the words "uniform throughout the United States," contemplated to confer the power to levy duties, imposts and excises, and yet to accompany this grant of authority with a restriction which had never found expression as to such taxes at that time anywhere, and which was contrary to the practice which had uniformly obtained both in the mother country and in the colonies, and in the States prior to the adoption of the Constitution. But, one of the most satisfactory answers to the argument that the uniformity required by the Constitution is the same as the equal and uniform clause which has since been embodied in so many of the state constitutions, results from a review of the practice under the Constitution from the beginning. From the very first Congress down to the present date, in laying duties, imposts and excises, the rule of inherent uniformity, or, in other words, intrinsically equal and uniform taxes, has been disregarded, and the principle of geograpical uniformity consistently enforced. Take, for a general example,

shillings. Male slaves were to be taxed at not exceeding five shillings, but it was provided "That no slave is to be taxed who is unable to work, or that may appear to the assessors to be no profit to his master or mistress." Fisheries where fish were caught for sale, and saw mills that sawed timber for sale or hire, were to be rated not exceeding two pounds.

In South Carolina, by an act passed March 28, 1787, 5 Stat. 24, entitled "An act for raising supplies for the year 1787," a tax of nine shillings and four pence was laid upon free negroes and mulattoes from 16 to 50 years of age, while the tax upon free white men was upon those neither lame or disabled, and who were between 21 to 50 years of age, while the tax was to be ten shillings per head. And a tax of one per cent was laid on the profits of faculties and professions, clergymen, schoolmasters and schoolmistresses excepted.

In Delaware, by a law passed in the sixteenth year of the reign of Geo. II (Laws of Delaware, Adams' ed., pub. 1797, p. 257), and apparently in force when the constitution of 1792 was adopted (Ib. pp. 396, 429), unsettled tracts and parcels of land were exempted from taxation, and the assessors were directed in assessing persons to have due regard "to such as are poor and have a charge of children," the poorer sort of such not to be rated under eight pounds. Single men without visible estate were to be rated at not less than twelve pounds nor more than twenty-four pounds, exempting, however, single men under twenty-one years of age, and apprentices and such as had not been out of apprenticeship more than six months.

specific import duties, by which particular specific rates are imposed on enumerated articles, without reference to their value. It is manifest that all such duties are void, if intrinsic equality and uniformity be the rule, and yet in all the great controversies which have arisen over the policy of impost duties generally, and particularly as to the economic wisdom of specific duties, never has it been contended that the power to impose them did not exist because of the uniformity clause of the Constitution. So, also, mention may be made of the common form of the excises on distilled spirits with the tax per gallon without reference to the value thereof.

Indeed, tariff duties have not only varied with different articles, but have varied with the different valuations of the same article. We cite a few instances of the latter character, found in the tariff acts of August 5, 1861, 12 Stat. 293, and August 27, 1894, 28 Stat. 530, respectively. In the act of 1861 a duty was imposed —

" On all silks valued at not over one dollar per square yard, thirty per centum ad valorem ; on all silks valued over one dollar per square yard, forty per centum ad valorem ; on all silk velvets or velvets of which silk is the component material of chief value, valued at three dollars per square yard or under, thirty per centum ad valorem; valued at over three dollars per square yard, forty per centum ad valorem."

In the act of 1894 occurs the following paragraph :

" 280. On woolen and worsted yarns made wholly or in part of wool, worsted, the hair of the camel, goat, alpaca or other animals, valued at not more than forty cents per pound, thirty per centum ad valorem ; valued at more than forty cents per pound, forty per centum ad valorem."

So also a single paragraph of the tariff acts has frequently contained an elaborate system of minimum classifications and compound duties, as well as exemptions for importations below a certain value. See provisions discussed in *Arthur* v. *Vietor*, 127 U. S. 572, 575 ; *Hedden* v. *Robertson*, 151 U. S. 520, 521 ; *Arthur* v. *Morgan*, 112 U. S. 495, 498.

Nor can it be said that these illustrations relate to legislation enacted long after the adoption of the Constitution, when by

lapse of time an erroneous conception as to the meaning of the Constitution had arisen, for the examples to which we have just referred are but types of many forms of taxation by way of duties, imposts and excises which were enacted without question from the very beginning, and have continued in an unbroken line to the present time, sanctioned by the founders of our institutions and approved in practical execution by all the illustrious men who have directed the public destinies of the nation. Excise taxes were largely used during the administration of President Washington, and again during and after the war of 1812. It may properly be said of these excises that none of them were uniform according to the principles now contended for, yet no constitutional question in this regard was ever raised about them. A partial list of some of the earlier acts is inserted in the margin.[1] We do not cite from the later revenue acts,

---

[1] Federal excises during the first generation after the Constitution.

I. *Washington's administration.*

March 3, 1791, ch. 15, §§ 14, 15, on distilled spirits; not uniform or proportionate to strength. No tax on country distilleries using home made materials.

May 8, 1792, ch. 32, § 1, on distilled spirits; country distillers taxed differently from those in cities, towns and villages; § 11, no drawback on any quantity less than 100 gallons.

June 5, 1794, ch. 45, § 1, on carriages. Contains some exemptions. Discussed in *Hylton* v. *United States,* 3 Dall. 171.

June 5, 1794, ch. 48, on licenses for making certain sales of wines or foreign distilled spirituous liquors.

June 5, 1794, ch. 51, §§ 1, 2, on snuff and refined sugar; § 14, no drawback on any quantity less than $12 worth. Discussed in *Pennington* v. *Coxe,* 2 Cranch, 33.

June 9, 1794, ch. 65, § 1, on auction sales; with exemption of judicial sales, sales of goods distrained or in insolvency; and of sales of produce of land, when sold on the land where produced, etc.; and of sales " of any farming utensils, stock or household furniture by persons removing from the place of their former residence, where the amount . . . shall not exceed $200."

March 3, 1795, ch. 43, § 1, on mortars and pestles, etc., in snuff mills; § 8, no drawback on any exports of snuff less than 300 lbs.

May 28, 1796, ch. 37, § 1, on carriages, with exemptions.

II. *Period of war of 1812.*

July 24, 1813, ch. 21, § 1, on refined sugar.

July 24, 1813, ch. 24, § 1, on carriages, with exemptions.

because of the numerous and familiar instances of such legislation which abound therein.

The necessities which gave birth to the Constitution, the controversies which preceded its formation, and the conflicts of opinion which were settled by its adoption, may properly be taken into view for the purpose of tracing to its source any particular provision, of the Constitution, in order thereby to be enabled to correctly interpret its meaning. *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 558.

The paralysis which the Articles of Confederation produced upon the Continental Congress because of the want of power in that body to enforce necessary taxation to sustain the government needs no more than statement. And the proceedings of the Congress during the Confederation afford abundant evidence of the constant effort which was made to overcome this situation by attempts to obtain authority from the States for Congress to levy the taxes deemed by it essential, and thus relieve it from the embarrassment occasioned by the fact that all demands for revenue depended for fulfillment wholly upon the action of the respective States. Despite the constant agitation as to the subject and the abundant discussions which took place

---

July 24, 1813, ch. 25, § 1, on licenses for distilling liquors.

July 24, 1813, ch. 26, § 1, on auction sales; ¼ of one per cent on sales of vessels; one per cent on other sales of goods, etc., with exemptions.

August 2, 1813, ch. 39, § 4, on licenses for retailing wines, etc.; one rate for cities, towns and villages, another for the country.

August 2, 1813, ch. 53, §§ 1, 2, on bank notes, etc., graduated but not ad valorem; commutable at 1½ per cent on dividends.

December 15, 1814, ch. 12, § 1, on carriages, graduated but not ad valorem.

December 21, 1814, ch. 15, § 1, on distilled spirits.

December 23, 1814, ch. 16, § 1, on auction sales; § 3, on retailers' licenses.

January 18, 1815, ch. 22, § 1, on domestic manufactures. Various specific and ad valorem rates, with exemptions, as umbrellas under $2, boots under $5 a pair.

January 18, 1815, ch. 23, § 1, on household furniture kept for use (annual duty) with minimum of $200, graduated but not ad valorem. The unit is the family; § 13, exemption of books, etc.; § 14, exemption of certain charitable, religious or literary institutions.

February 27, 1815, ch. 61, on plate.

April 19, 1816, ch. 58, § 4, on licenses for distilling liquors.

in relation to it during the period of the Confederation, in the whole of the proceedings not a word can be found which can give rise to even the suggestion that there was then any thought of restraining the taxing power with reference to the intrinsic operation of a tax upon individuals. On the contrary, the sole and the only question which was ever present and in every form was discussed, was the operation of any taxing power which might be granted to Congress upon the respective States; in other words, the discrimination as regards States which might arise from a greater or lesser proportion of any tax being paid within the geographical limits of a particular State.

The proceedings of the Continental Congress also make it clear that the words "uniform throughout the United States," which were afterwards inserted in the Constitution of the United States, had, prior to its adoption, been frequently used, and always with reference purely to a geographical uniformity and as synonymous with the expression, "to operate generally throughout the United States." The foregoing situation so thoroughly permeated all the proceedings of the Continental Congress that we might well rest content with their mere statement. We shall, however, make a few references on the subject.

The view that intrinsic uniformity was not then conceived is well shown by remarks by Mr. Wilson upon a proposition submitted by him to the Continental Congress on March 18, 1783, (5 Ell. Deb. 67,) that Congress be empowered to lay and impose "a tax of one quarter of a dollar per hundred acres on all located and surveyed lands within each of the States." He said, speaking of the proposed tax, "that it was more moderate than had been paid before the Revolution, and it could not be supposed the people would grudge to pay, as the price of their liberty, what was formerly paid to their oppressors."

As early as February, 1781, a resolution was proposed authorizing Congress to levy certain taxes and duties, which resolution contained the proviso, "and the same articles shall bear the same duty and impost throughout the said States without exemption." 1 Ib. p. 92.

Though this resolution failed of passage, a report of the committee of the whole was agreed to on the same day, in the form

of a resolution recommended to the several States to levy for the use of the United States a duty of 5 per cent upon imports, with certain exceptions, and a duty of 5 per cent upon all prizes and prize goods. As late as December, 1782, however, some of the States had failed to comply with this resolution. 5 Ell. Deb. 13.

On January 25, 1783, (5 Ib. 31,) a resolution was proposed declaring that Congress would " make every effort in their power to obtain, from the respective States, *general* and substantial funds adequate to the object of funding the whole debt of the United States ; " . . . The word " general " was stricken out, because susceptible of being considered as implying that every object of taxation within the States should be embraced. That is to say, in order to remove any impression that the word " general " might imply the obligation to levy on all articles, the phraseology of the previous resolution was changed so as to cause the word to have merely a geographical significance, viz., to require that whatever subject of taxation was assessed, the same subject should be taxed in every State, or, in other words, that the particular tax should operate generally throughout the United States. Two days later, a new resolution having been introduced declaring it to be the opinion of Congress that *general* funds should be established, to be collected by Congress, the same objection was repeated, (Ib. 34,) and the proposition was amended so as to read " establishment of permanent and adequate funds to operate generally throughout the United States." There being controversy as to whether Congress should be allowed to collect the taxes, (Ib. 34,) the debates record the following proceedings :

" On the motion of Mr. Madison, the whole proposition was new modelled, as follows :

" ' That it is the opinion of Congress that the establishment of permanent and adequate funds, *to operate generally throughout the United States*, is indispensably necessary for doing complete justice to the creditors of the United States, for restoring public credit, and for providing for the future exigencies of the war.'

" The words ' to be collected under the authority of Congress ' were, as a separate question, left to be added afterwards."

Mr. Madison, after commenting on the demerits of the plans just referred to, prefaced his subsequent remarks with the following (Ib. p. 36): ".It remains to examine the merits of a plan of general revenue *operating throughout the United States,* under the superintendence of Congress."

On March 11, 1783, (5 Ell. Deb. 64), a vote was taken upon three questions, the first being: "Shall any taxes, *to operate generally throughout the States,* be recommended by Congress, other than duties on foreign commerce?" The matter culminated on April 18, 1783, in the adoption of a resolution by nine States, recommending to the several States that Congress be vested with the power to levy, for the use of the United States, certain duties, as well specific as ad valorem, upon goods imported into the States from any foreign port, island or plantation. (1 Ell. Deb. 93.)

In an address which submitted the resolution to the States it was observed (Ib. 97):

"To render this fund as productive as possible, and, at the same time, to narrow the room for collusions and frauds, it has been judged an improvement of the plan to recommend a liberal duty on such articles as are most susceptible of a tax according to their quantity, and are of most equal and general consumption; leaving all other articles, as heretofore proposed, to be taxed according to their value."

It was also stated in the address that " to bring this essential resource (a tax on imposts) into use . . . a concerted *uniformity* was necessary;" and "that this *uniformity* cannot be concerted through any channel so properly as through Congress."

Thus it is apparent that the expression "uniform throughout the United States" was at that time considered as purely geographical, as being synonymous with the expression "general operation throughout the United States," and that no thought of restricting Congress to intrinsic uniformity obtained, since the powers recommended were absolutely in conflict with such theory.

The reasons advanced by those who opposed the various resolutions to which we have referred are, if anything, more deci-

sive than are the matters to which we have called attention. Those reasons were predicated upon the inequality among the States which might arise from the granting to Congress the power to lay duties, imposts and excises. That is, if a particular article was levied on generally throughout the various States by an excise or duty, as a greater quantity of that article might be found in one State than in other States, it was asserted the burden would be unequal because the former State would pay a greater proportion of the tax. This form of objection is well illustrated by what was said by Mr. Rutledge and Mr. Lee against the grant of power to Congress to lay duties or excises, to operate generally throughout the United States. We quote from 5 Ell. Deb. p. 34, as follows:

"Mr. Rutledge objected to the term '*generally*,' as implying a degree of *uniformity* in the tax which would render it unequal. He had in view, particularly, a land tax, according to quality, (quantity? See note, p. 37,) as had been proposed by the office of finance.

\* \* \* \* \* \* \* \*

"Mr. Lee seconded the opposition to the term 'general.' He contended that the States would never consent to a uniform tax, because it would be unequal."

Again (Ib. p. 37) Mr. Rutledge complained "that those who so strenuously urged the necessity and competency of a general revenue, operating throughout all the United States at the same time, declined specifying any general objects from which such a revenue could be drawn." And the same reason was urged for refusing the authority to lay imposts throughout the United States, as is shown by the objections made, to which we shall now refer. Thus, with respect to duty on imported salt, it was argued that it would bear injuriously on the eastern States "on account of salt consumed in the fisheries, and that besides it would be injurious to the national interest by adding to the cost of fish." 5 El. Deb. 61. So, also, Rhode Island protested against the grant of the power to impose duties recommended by the resolution of April 18, 1783, previously referred to, on the ground "that the proposed duty would be unequal in its operation, bearing hardest upon the most commercial States,

and so would press peculiarly hard upon that State which draws its chief support from commerce." 1 El. Deb. 101. And the nature of this objection caused it to come to pass that in the subsequent discussions in Congress, the claim that it was essential to confer upon Congress the authority to lay duties, imposts and excises to be uniform throughout the United States, became associated in the discussion with the asserted necessity that Congress should have the power to establish uniform regulations of commerce to prevent the discrimination resulting from the laying of duties, imposts and excises by the respective States. 1 Ib. 112. The association of the two subjects evolved by their natural relation is well shown by a resolution of Mr. Madison, introduced in the Virginia house of delegates in 1784, (Ib. 114,) " wherein it was proposed that the delegates from the State of Virginia should be instructed to propose in Congress a recommendation to the States in Union, to authorize that assembly to regulate their trade," on principles and under qualifications stated in the following paragraphs:

" 1st. That the United States in Congress assembled be authorized to prohibit vessels belonging to any foreign nation from entering any of the ports thereof, or to impose any duties on such vessels and their cargoes which may be judged necessary ; all such prohibitions and duties to be *uniform throughout the United States,* and the proceeds of the latter to be carried into the treasury of the State within which they shall accrue.

" 2d. That no State be at liberty to impose duties on any goods, wares or merchandise, imported, by land or by water, from any other State, but may altogether prohibit the importation from any State of any particular species or description of goods, wares or merchandise, of which the importation is at the same time prohibited from all other places whatsoever."

It will be noticed that the words " uniform throughout the United States " are the same which were subsequently adopted in the clause of the Constitution under consideration, and that the term uniformity, in the resolution of Mr. Madison, was applied not only to duties, but to *regulations and prohibitions respecting external commerce,* which were designed to be *the same* all over the Union.

Though the resolution of Mr. Madison was not adopted, it led to the sending by Virginia of commissioners to Annapolis to meet commissioners from the other States, the result of which meeting was the Federal convention of 1787.

Considering the proceedings of the convention, the same observation is pertinent which we have previously made as to the Continental Congress, viz., that, despite the struggles and controversies which environed the final adoption of the Constitution, not a single word is found in any of the debates, or in any of the proceedings or historical documents cotemporaneous and concurrent with the adoption of the Constitution, which give the slightest intimation that any suggestion was ever made that the grant of power to tax was considered from the point of view of its operation upon the individual. The struggles which were flagrant in the Continental Congress were transferred to the convention. The question of the undue proportion of taxation which might fall upon one or more States if direct taxes were laid was solved by the principle of apportionment of direct taxes, duties, imposts and excises, which were only subjected to the requirement of uniformity throughout the United States, these words, as we have shown, having acquired at that time an unquestioned meaning.

Without going into minute detail, the mention of a few salient particulars will serve to show how the result of the convention brought together the provisions as to the uniformity of duties, imposts and excises throughout the United States and the restriction against discriminating commercial regulations by Congress, just as they had by the force of circumstances been drawn together in the Continental Congress, and how their solution in the Constitution was substantially in accord with the resolution of Mr. Madison, introduced into the Virginia house of delegates, to which we have referred.

The draft of a Federal Constitution, submitted to the convention by Mr. Pinckney, provided in the first and second paragraphs as follows (5 Ell. Deb. 130):

" Art. VI. The legislature of the United States shall have the power to lay and collect taxes, duties, imposts and excises;

" To regulate commerce with all nations and among the several States;

   *  *  *  *  *  *  *  *

" The proportion of direct taxation shall be regulated by the whole number of inhabitants of every description; which number shall, within —— years after the first meeting of the legislature, and within the term of every —— year after, be taken in the manner to be prescribed by the legislature.

 " No tax shall be laid on articles exported from the States; nor capitation tax, but in proportion to the census before directed."

No other provision was made respecting taxation.

The plan of Mr. Paterson, of New Jersey, provided, in addition to the powers vested in Congress by the Articles of Confederation, (p. 191,) that Congress should be authorized " to pass acts for raising a revenue, by levying a duty or duties on all goods and merchandise of foreign growth or manufacture, imported into any part of the United States; by stamps on paper, vellum or parchment, and by a postage on all letters and packages passing through the general post office—to be applied to such Federal purposes as they shall deem proper and expedient; to make rules and regulations for the collection thereof; and the same from time to time to alter and amend, in such manner as they shall think proper; to pass acts for the regulation of trade and commerce, as well with foreign nations as with each other."

By another section of the Paterson plan, it was provided that whenever requisitions upon the States should be necessary, they should be made by the rule of numbers and not by value of land, as under the Confederation; and the Congress was to be authorized " to devise and pass acts" directing and authorizing the collection of requisitions when not complied with. It is thus seen that both of the plans referred to made no provision for uniformity of taxation in the sense contended for by the opponents of the tax now under consideration. The committee of detail, in the first section of article VII of their draft of a proposed constitution, reported the two clauses of the plan of Mr. Pinckney first quoted, substituting the word " foreign "

for the word "all" before the word "nations." .5 Ell. Deb. 378.

On August 25, 1787, the following occurred (Ib. 478):

"Mr. Carroll and Mr. L. Martin expressed their apprehensions, and the probable apprehensions of their constituents, that, under the power of regulating trade, the general legislature might favor the ports of particular States, by requiring vessels destined to or from other States to enter and clear thereat, as vessels belonging or bound to Baltimore, to enter and clear at Norfolk, etc. They moved the following proposition:

"'The legislature of the United States shall not oblige vessels belonging to citizens thereof, or to foreigners, to enter or pay duties or imposts in any other State than in that to which they may be bound, or to clear out in any other than the State in which their cargoes may be laden on board; nor shall any privilege or immunity be granted to any vessel on entering or clearing out, *or paying duties or imposts in one State in preference to another.*'"

On the same day Mr. McHenry and General Pinckney submitted a proposition (which was referred *nem. con.* to a committee) relating to the establishment of new ports in the States for the collection of duties or imposts, which concluded as follows (p. 479):

"All duties, imposts and excises, prohibitions or restraints, laid or made by the legislature of the United States, *shall be uniform and equal* throughout the United States."

The fourth section of the seventh article of the proposed constitution reported by the committee on detail, on August 6, 1787, read as follows (p. 379):

"Sec. 4. No tax or duty shall be laid by the legislature on articles exported from any State; nor on the migration or importation of such persons as the several States shall think proper to admit; nor shall such migration or importation be prohibited."

The committee to whom these propositions were referred made a report on August 28, in effect embodying both propositions in one paragraph, as follows (Ib. 483):

"That there be inserted, after the fourth clause of the seventh

section, ' nor shall any regulation of commerce or revenue *give preference to the ports of one State over those of another*, or oblige vessels bound to or from any State to enter, clear or pay duties, in another; and all *tonnage duties, imposts and excises*, laid by the legislature, *shall be uniform throughout the United States.*' "

It will be noticed that the committee recommended, not merely that preferences between ·ports should be forbidden by "any regulation of commerce," but also that such preferences should not be made by "any regulation of *revenue.*" This, obviously, rendered it unnecessary to include, in the latter part of the clause, "prohibitions or restraints," as proposed by Mr. McHenry and General Pinckney. The substantial effect of the first clause of the paragraph was to require that all regulations of commerce *or of revenue* affecting commerce through the ports of the States should be the same in all ports.

It follows from the collocation of the two clauses that the prohibition as to preferences in regulations of commerce between ports and the uniformity as to duties, imposts and excises, though couched in different language, had absolutely the same significance. The sense in which the word "uniform" was used is shown by the fact that the committee, whilst adopting in a large measure the proposition of Mr. McHenry and General Pinckney, "that all duties, imposts, excises, prohibitions or restraints . . . shall be uniform and equal throughout the United States," struck out the words "and equal." Undoubtedly this was done to prevent the implication that taxes should have an equal effect in each State. As we have seen, the pith of the controversy during the Confederation was that even, although the same duty or the same impost or the same excise was laid all over the United States, it might operate unequally by reason of the unequal distribution or existence of the article taxed among the respective States.

On August 31, 1797, the report of the committee was acted upon as follows (5 Ell. Deb. 502): The provision, "Nor shall any regulation of commerce or revenue give preference to the ports of one State over those of another," was adopted *nem. con.* After discussion the clause, " or oblige vessels bound to or from

any State to enter, clear or pay duties in another," was agreed to. Quoting from the debates at page 503:

" The word ' tonnage' was struck out *nem. con.*, as comprehended in ' duties.'

" On the question on the clause of the report—' and all duties, imposts and excises, laid by the legislature, shall be uniform throughout the United States'—it was agreed to *nem. con.*"

In a foot-note, it is said:

" In the printed journal, New Hampshire and South Carolina entered in the negative."

On September 4, 1787, the committee to whom sundry resolutions, etc., had been referred on August 31, recommended, among others, the following addition and alteration to the report before the convention (pp. 506 to 507):

" 1. The first clause of article 7, section 1, to read as follows: ' The legislature shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States.'

" 2. At the end of the second clause of article 7, section 1, add, ' and with the Indian tribes.' "

The committee on style, on September 12, 1787, reported a plan of the Constitution, (p. 535,) the foregoing provision conferring authority to lay taxes, etc., being designated as section 8 of article 1.

On September 14, 1783, the words " But all such duties, imposts and excises shall be uniform throughout the United States," which, in their adoption had been associated with and formed but a part of the clause forbidding a preference in favor of the port of one State over the port of another State—in other words, had been a part of another clause—were shifted, by a unanimous vote, from that paragraph, and were annexed to the provisions granting the power to tax.

Thus, it came to pass that although the provisions as to preference between ports and that regarding uniformity of duties, imposts and excises were one in purpose, one in their adoption, they became separated only in arranging the Constitution for the purpose of style. The first now stands in the Constitution as a part of the sixth clause of section 7 of article 1, and the

other is a part of the first clause of section 8 of article 1. By the result then of an analysis of the history of the adoption of the Constitution it becomes plain that the words "uniform throughout the United States" do not signify an intrinsic but simply a geographical uniformity. And it also results that the assertion to which we at the outset referred, that the decision in the *Head Money cases*, holding that the word uniform must be interpreted in a geographical sense, was not authoritative, because that case in reality solely involved the clause of the Constitution forbidding preferences between ports, is shown to be unsound, since the preference clause of the Constitution and the uniformity clause were, in effect, in framing the Constitution, treated, as respected their operation, as one and the same thing, and embodied the same conception.

We add that those who opposed the ratification of the Constitution clearly understood that the uniformity clause as to taxation imported but a geographical uniformity, and made that fact a distinct ground of complaint. Thus in the report made to the legislature of Maryland by Luther Martin, attorney general of the State, detailing and commenting upon the proceedings of the convention of 1787, of which convention Mr. Martin was a delegate, in the course of comments upon the tax clause of the Constitution Mr. Martin said (1 Ib. p. 369):

"Though there is a provision that all duties, imposts and excises shall be uniform—*that is, to be laid to the same amount on the same articles in each State*—yet this will not prevent Congress from having it in their power to cause them to fall very unequally and much heavier on some States than on others, because these duties may be laid on articles but little or not at all used in some other States, and of absolute necessity for the use and consumption in others; in which case, the first would pay little or no part of the revenue arising therefrom, while the whole or nearly the whole of it would be paid by the last, to wit, the States which use and consume the articles on which imposts and excises are laid."

Having disposed of the question of uniformity, we are next brought to consider certain contentions which relate to that subject. It is argued that even although it be conceded that

the uniformity required by the Constitution is only a geographical one, the particular law in question does not fulfill the requirements of even geographical uniformity, since it does not apply to the District of Columbia. We think this contention is without merit.

The proposition is predicated upon the fact that the statute purports to lay the tax upon legacies and distributive shares "passing, after the passage of this act, from any person possessed of such property, either by will or by the intestate laws of any State or Territory;" and provides that the receipt for the tax will entitle an administrator, etc., to credit to the amount of the payment made to the collector "by any tribunal which, by the laws of any State or Territory, is, or may be, empowered to decide and settle the accounts of executors and administrators."

This, it is asserted, does not embrace the District of Columbia. Without attempting to determine whether the necessary construction of the statute would require the inclusion of the District of Columbia within its terms, aside from any special provision bearing upon the question, we think the provisions of section 31 of the act makes the objection untenable. That section provides as follows (30 Stat. 466):

"Sec. 31. That all administrative, special or stamp provisions of law, including the laws in relation to the assessment of taxes, not heretofore specifically repealed, are hereby made applicable to this act."

The result of this provision is to carry into the law under review the provisions of section 3140 of the Revised Statutes, relating to internal revenue laws generally. It is as follows:

"3140. The word 'State,' when used in this title, shall be construed to include the Territories and the District of Columbia, where such construction is necessary to carry out its provisions."

It is yet further asserted that the tax does not fulfill the requirements of geographical uniformity, for the following reason: As the primary rate of taxation depends upon the degree of relationship or want of relationship to a deceased person, it is argued that it cannot operate with geographical uniformity, inasmuch as testamentary and intestacy laws may differ in every

State.   It is certain that the same degree of relationship or want
of relationship to the deceased, wherever existing, is levied on
at the same rate throughout the United States.   The tax is
hence uniform throughout the United States, despite the fact
that different conditions among the States may obtain as to the
objects upon which the tax is levied.   The proposition in sub-
stance assumes that the objects taxed by duties, imposts and
excises must be found in uniform quantities and conditions in
the respective States, otherwise the tax levied on them will
not be uniform throughout the United States.   But what the
Constitution commands is the imposition of a tax by the rule
of geographical uniformity, not that in order to levy such a
tax objects must be selected which exist uniformly in the sev-
eral States.   Indeed, the contention was substantially disposed
of in the *License Tax cases,* 5 Wall. 472, previously referred
to.   It was there urged that, as the several States had the
right to forbid the carrying on of the liquor traffic, therefore
Congress had no power to license such traffic, because it would
interfere with the authority of the State.   It was held that
the license was validly imposed, that it did not interfere with
the power of the States to prevent the liquor traffic, because
in a. State where such traffic was forbidden the license would
be inoperative; but in the States where such traffic was al-
lowed, the license would be effective.   The argument, how-
ever, is additionally fully answered by the review which we
have made of the origin and meaning of the expression " uni-
form throughout the United States."   From that review it ap-
pears that the very objection upon which the proposition now
advanced must rest was urged in the Continental Congress as
the reason why the levy of uniform duties, imposts and excises
throughout the United States should not be authorized.   This
is shown by the objection of Mr. Rutledge and the suggestion
of Mr. Lee.   It is further shown by the protest of Rhode Is-
land, and the reasons advanced why a duty on salt should not
be levied.   But it was seen that if it were required, not only
that the duties, imposts and excises should be uniform through-
out the United States, but that in imposing them objects should
be selected existing in equal quantity in the several States, the

grant of power to levy duties, imposts and excises would be a failure. In the convention which framed the Constitution the same argument was used without success, and, as we have seen, the only ground upon which the striking out of the words "and equal" after the word "uniform," in the adoption of the clause as now found in the Constitution, can be reasonably explained, is that it was done to prevent the implication that the duties, imposts and excises which were to be uniform throughout the United States were to be placed upon rights equally existing in the several States. To now adopt the proposition relied on would be virtually, then, to nullify the action of the convention, and would relegate the taxing power of Congress to the impotent condition in which it was during the Confederation.

Lastly, it is urged that the progressive rate feature of the statute is so repugnant to fundamental principles of equality and justice that the law should be held to be void, even although it transgresses no express limitation in the Constitution. Without intimating any opinion as to the existence of a right in the courts to exercise the power which is thus invoked, it is apparent that the argument as to the enormity of the tax is without merit. It was disposed of in *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 293.

The review which we have made exhibits the fact that taxes imposed with reference to the ability of the person upon whom the burden is placed to bear the same have been levied from the foundation of the government. So, also, some authoritative thinkers, and a number of economic writers, contend that a progressive tax is more just and equal than a proportional one. In the absence of constitutional limitation, the question whether it is or is not is legislative and not judicial. The grave consequences which it is asserted must arise in the future if the right to levy a progressive tax be recognized involves in its ultimate aspect the mere assertion that free and representative government is a failure, and that the grossest abuses of power are foreshadowed unless the courts usurp a purely legislative function. If a case should ever arise, where an arbitrary and confiscatory exaction is imposed bearing the guise of a progressive or any other form of tax, it will be time enough to consider

whether the judicial power can afford a remedy by applying inherent and fundamental principles for the protection of the individual, even though there be no express authority in the Constitution to do so. That the law which we have construed affords no ground for the contention that the tax imposed is arbitrary and confiscatory, is obvious.

It follows from the foregoing opinion that the court below erred in denying all relief, and that it should have held the plaintiff entitled to recover so much of the tax as resulted from taxing legacies not exceeding ten thousand dollars, and from increasing the tax rate with reference to the whole amount of the personal estate of the deceased from which the legacies or distributive shares were derived. For these reasons

*The judgment below must be reversed and the case be remanded, with instructions that further proceedings be had according to law and in conformity with this opinion, and it is so ordered.*

Mr. Justice Brewer dissented from so much of the opinion as holds that a progressive rate of tax can be validly imposed. In other respects he concurred.

Mr. Justice Peckham took no part in the decision.

Mr. Justice Harlan, with whom concurred Mr. Justice McKenna, dissenting.

While I concur in the construction placed by the court upon the clause of the Constitution declaring that all duties, imposts and excises shall be " uniform throughout the United States," I dissent from that part of the opinion construing the twenty-ninth and thirtieth sections of the Revenue Act. In my judgment, the question whether the tax presented by Congress shall or shall not be imposed is to be determined with reference to the whole amount of the personal property out of which legacies and distributive shares arise. If the value of the whole personal property held in charge or trust by an administrator, executor or trustee exceeds ten thousand dollars, then every part of it constituting a legacy or distributive share, except the share of

a husband or wife, is taxed at the progressive rate stated in the act of Congress. I do not think the act can be otherwise interpreted without defeating the intent of Congress.

Construed as I have indicated, the act is not liable to any constitutional objection.